427 P.2d 284

**TRANSAMERICA LEASING CORPORATION, a California corporation, Plaintiff-Respondent,**

v.

**VAN'S REALTY COMPANY, Inc., an Idaho corporation, Defendant-Appellant.**

**No. 9788.**

Supreme Court of Idaho.

May 2, 1967.

As Corrected May 10, 1967.

Scott W. Reed, Coeur d'Alene, for appellant.

Miller & Knudson, Coeur d'Alene, for respondent.

McQUADE, Justice.

This case concerns a lease of machinery by Skaggs Utah Leasing Corporation to Van Kleeck Creamery, Inc. With regard to the lease, appellant, Van's Realty Co., Inc., is successor in interest to Van Kleeck Creamery, and respondent, Transamerica Leasing Corporation, is successor in interest to Skaggs Utah Leasing Co. Western Frozen Products Co., Inc., not a party to this proceeding,[1] built the machine. As the following statement of facts reveals, Van Kleeck assisted Western regarding the machine's construction, but the degree of Van Kleeck's participation and the nature of Van Kleeck's relation with Western is disputed. Western asked Skaggs to finance the venture by purchasing the machine from it when constructed, and then immediately to lease it to Van Kleeck. This was done, but the parties controvert whether Skaggs' role was only that of financial intermediary or whether Skaggs assumed responsibility for the machine's efficient operation. The machine, composed of a number of separate devices, was delivered by Western to Van Kleeck, whereupon Skaggs paid Western the purchase price and Van Kleeck began remitting monthly rent to Skaggs. The machine never operated properly and this action brought by Skaggs to recover rent from Van Kleeck must determine as between the successors of Van Kleeck and Skaggs which will bear the los. The pertinent facts are detailed hereinafter.

In early 1958, Harold Komberec and Harold Fiedler conferred with Royal Shields, then acting manager of Van Kleeck Creamery, in the creamery's Coeur d'Alene office, regarding the production and sale of a novelty ice cream confection, Froz-O-Log.[2] Komberec and Fiedler showed Fields samples of the confection and a small machine, non-automatic in some of its operations, which produced the novelty food. After agreeing with Shields on a royalty payment plan, Komberec and Fiedler soon began manufacturing Froz-O-Logs in Van Kleeck's Coeur d'Alene plant, the creamery supplying some of the materials and marketing the finished product. The venture prospered and, as Royal Shields testified, "eventually our demand grew to such an extent that the machine was not capable of producing enough logs."

In the spring of 1960, Harold Ellison, a managing official of Western Frozen Products Co., Inc., met with Royal Shields in Van Kleeck's Coeur d'Alene plant concerning the construction of a larger and more efficient Froz-O-Log machine. This meeting followed up an earlier discussion during which Shields had told Ellison that Van Kleeck intended to expand its production of the confection. The managing officials of Western Frozen Products (who besides Harold Ellison were David Ellison and Harold Ellsworth) consulted with Komberec and Fiedler, who were then operating the original Froz-O-Log machine in Van Kleeck's plant, regarding the original machine's mechanical operation. Komberec and Fiedler, according to Fiedler's testimony, "went with Western Frozen Products in an effort to develop an automatic equipment system." Komberec's and Fiedler's business relation with Western was as follows, Fiedler testified:

"We [Komberec and he] did not have finances to handle a product like this [constructing a new, fully automatic machine] * * * therefore we had

1. Van Kleeck filed a third-party complaint in this action against Western, but this was dismissed on respondent's motion prior to trial.

2. The Froz-O-Log product was composed of frozen ice cream in a cylinder shape, approximately one inch in diameter and perhaps six to eight inches long, covered with chocolate, sprinkled with graham cracker crumbs and packaged.

agreed with Western Frozen Products [that] * * * we would furnish to them the amount of research and development we had, the information we had and they would take it from there and furnish the funds in order to develop a piece of equipment that would meet the industry standard at that time."

The project to develop a new, automatic Froz-O-Log machine was admittedly a speculative venture. The collaboration between Western Frozen Products and Komberec and Fiedler, according to Fiedler, "was the first stage in development of an automatic machine" to make the confection. Fiedler also testified: "there was speculation as to whether or not you could manufacture this type of automatic machine to manufacture Froz-o-Logs," and the machine's construction was "sort of a trial and error process." Komberec testified that during 1960 the confection was a "new innovation" and "the equipment * * * used * * * was in the development stage." Royal Shields, who holds a college engineering degree, had been in the creamery business for at least twenty-five years by 1960 and during that year managed a business and interlocking operations with gross annual sales above one million dollars. Van Kleeck Creamery was constantly expanding, ampliying its products and services, during the late 1950's and early 1960's and Shields knew, he testified, that an automatic Froz-O-Log machine would be a "new innovation." Fiedler said he "assumed" that Shields knew during early 1960 that a fully automatic Froz-O-Log machine had never been constructed.

Approximately one month after their first conference in the spring of 1960, Harold Ellison and Royal Shields again met a Van Kleeck's office in Coeur d'-Alene, at which time Ellison reported that he had procured a design for an automatic Froz-O-Log machine. In response to a question concerning the initial expense during its construction, Ellison immediately made outside inquiries about financing. A lease was offered by a third party but was unacceptable to Shields. Shortly thereafter, David Ellison and Harold Ellsworth, on behalf of Western Frozen Products, approached Lewis North, then president and the managing official of Skaggs Utah Leasing Co., to determine if Skaggs would consider issuing a lease on the new machine to Van Kleeck Creamery. Skaggs Utah Leasing Co. was at that time primarily a one-man operation, North being its only employee (although a credit committee had some control over prospective leases). The company leased a variety of items, including furniture and fixtures, cash registers, trailers and heavy duty machinery. The officials of Western Frozen Products gave him no description of the mechanics in the new device, North testified,[3] nor did he inquire about the machine's operation. He was told only that the new machine would be specially built to make Froz-O-Logs. On behalf of Skaggs Utah Leasing Co. North told Western's officers, he testified, that "we would be glad to consider it [a lease] based on the financial stabilization of" Van Kleeck Creamery.

Skaggs limited its investigation of the prospective lease to examination of Van Kleeck Creamery's financial position; no technical study was made of the machinery itself. This was Skaggs' normal procedure, for North testified, "Our basis, of course, was handling the money. The machinery would be up to the manufacturer and the client, the manufacturer's client." Skaggs' credit committee shortly determined to issue the lease to Van Kleeck and as a preliminary matter, on May 25, 1960, Skaggs granted Western Frozen Products an option to repurchase the Froz-O-Log machine at the end of the original lease which Skaggs was about to contract with Van Kleeck. This was at Western's re-

---

3. At the time of trial, North owned and operated a retail store in Colorado and was not commercially interested in any of the parties herein.

quest, "possibly to protect their franchise agreements" on the Froz-O-Log product, North suggested.

Skaggs never had any direct contact with Van Kleeck's; all of Skaggs' business regarding issuance of the lease was arranged with the officials of Western. In response to questions by respondent's attorney, North described Skaggs' usual conduct regarding communication with the lessee before issuing a lease:

"Q In regard to contacting the lessee, who has arranged the transaction insofar as equipment is concerned, the manufacturer?

"A The manufacturer, supplier of the equipment.

"Q Insofar as equipment or machinery, whichever is being leased, that is the arrangement between the lessee and the manufacturer?

"A Yes.

"Q After the manufacturer and the lessee have come to their arrangement or their agreement, then you buy the equipment from the manufacturer and lease it to the lessee?

"A Yes, that is correct.

"Q This is your usual and normal way of doing business?

"A That's correct.

"Q You don't buy it until the lessee has stated he accepted the equipment from the manufacturer?

"A That is correct.

"Q This is the normal way you do this business?

"A Yes, sir."

On June 4, 1960, Harold Ellison and Ellsworth of Western Frozen Products brought the lease, in Ellsworth's private plane, to the Van Kleeck Creamery in Coeur d'Alene. Royal Shields and Arvid Johnson, president of Van Kleeck Cream-

ery, Inc., there signed the lease and a corporate guarantee which Shields made out for a maximum of $35,000, the amount on which Skaggs and Western had agreed and which formed the basis for computation of rent payments in the lease. A franchise agreement for the manufacture, production and marketing of Froz-O-Logs was simultaneously entered between Shields for Van Kleeck ("Licensee"), and Harold Ellison for Western ("Licensor"). Four areas in the western states were delineated and the agreement gave Van Kleeck immediate right to produce and market in one area with an option on each and all of the remaining areas. The franchise agreement recited "the Licensor [Western] has leased to the Licensee [Van Kleeck] one model 80 Froz-o-Log freezer machine * * * for the purpose of servicing Distribution Area No. 1," and the option agreement provided that if Van Kleeck sought to exercise an option for any or all of the other three areas, it had to "lease from the Licensor [Western] a Froz-o-Log freezer machine or machines capable of producing 500 dozen Froz-o-Logs per hour" for each optioned area, which "lease of said Froz-o-Log machine shall be in all respects the same as the lease of the Froz-o-Log machine heretofore leased by the Licensor [Western] to the Licensee [Van Kleeck]." The rental period on each new machine would be five years, with total payments fully covering the cost (plus 29.6%) of the machine's manufacture "to the Licensor [Western]." Lest confusion develop here it should be noted that, while the reason for such characterization was not developed upon trial, Western is indeed identified as the machine's lessor in both the franchise and franchise option agreements.

The lease is one page long, containing seventeen terms and conditions on the rear of the form. Rental was to begin on the first day of the month after delivery and the components of the machine to be constructed were identified by Western Frozen Products and typewritten in Schedule "A."

This constitutes the machinery's only description in the lease and is as follows:

"1 only Automatic Froz-O-Log Ice Cream Bar Machine, composed of:

"1 only Sharp room Freezing Tunnel with extruder nozzles, pan conveyer, and cut off device.

"2 only Blast Coils with Fans.

"2 only Compressors with Defrost Systems.

1 Low Stage Unit.

1 Condensing Unit.

"1 only Needle Coating and Crumbing Machine.

"1 only Automatic Bagging Machine together with Connection Conveyers, Motors and Auxiliary Equipment."

The terms required that the lessee would at its own expense install the machine, maintain it in good order and "make all rental payments hereunder when due notwithstanding that such Equipment or any part thereof is for any reason not in running order." The lease also provided that "Lessor shall have no responsibility in connection with maintenance, repair or replacement of the Equipment or parts, the sole obligation therefore being the Lessee's," and that the lessee had to procure all insurance and indemnify the lessor against "any damage to or loss of the Equipment * * *, however occasioned," and also against any damage claims arising from operation of the machine. Upon failure to pay rent at proper times, the total rental became immediately due.

Concerning promises or warranties regarding the machine's operation, term fifteen states: "Lessee agrees that Lessor has made no warranty or representation with respect to the suitability or durability of the Leased Equipment for the purpose intended by the Lessee"; term seventeen provides:

"No representations, warranties, promises, guarantees or agreements, oral or written, expressed or implied, have been made by either party hereto with respect to this lease or the Equipment." Term sixteen, however, which primarily pertains to the lessee's responsibilities for installation and maintenance,[4] contains a provision that: "Lessor shall extend unto Lessee all vendor's warranties and guarantees."

Lessor also covenanted its ownership and promised lessee peaceful possession of the machine so long as rent payments were not in default.

On June 9, 1960, North, for Skaggs Utah Leasing Co., wrote to Western Frozen Products:

"We have negotiated a lease with Van Kleeck Creamery * * *. Schedule 'A' calls for one automatic Froz-o-Log machine composed of various components for which you have approved plans for the special construction.

"This letter is to authorize you to construct this machine in accordance with the requirements of Van Kleeck Creamery, Inc., and to their satisfaction. Subject to this arrangement, upon completion and delivery we will pay you the sum of $35,000 for which you are to deliver a Bill of Sale to Skaggs Utah Leasing Company * * *.

"We would suggest that if you have not the approval of Van Kleeck Creamery, Inc. _as to the plans and specifications that you obtain a wire or a letter from them in order to protect yourselves on their acceptance of the equipment. * * "

On July 20, 1960, Royal Shields, for Van Kleeck Creamery, signed a letter addressed to North at Skaggs Leasing Company, which states in its entirety:

"In accordance with our Lease Agreement dated June 4, 1960, we hereby ad-

---

4. "16. *Lessee Installation:* Lessee, at its own expense, will install the aforesaid Equipment at the stipulated premises (unless otherwise set forth herein) and will, throughout the rental period, maintain it in good, efficient running order and will make all rental payments hereunder when due notwithstanding that such Equipment or any part thereof is for any reason not in such running order. Lessor shall extend unto Lessee all vendor's warranties and guarantees."

vise you that the Froz-o-Log ice cream bar machine called for under this lease has been delivered to and accepted by us."

Shields testified that, "The items listed in Schedule A of the lease agreement [had] arrived" immediately before he signed the letter of acceptance, but he qualified this by adding that "some of the pieces had not [then] arrived."

On July 28, 1960, after receipt of this letter of acceptance, North for Skaggs paid Western Frozen Products $30,000, balance due for constructing the new Froz-O-Log machine ($5,000 had been advanced during construction). With Harold Ellison and Fiedler supervising, assembly and installation was soon begun.

Van Kleeck Creamery paid rent to Skaggs Utah Leasing Co. between September 1960 and August 1961 (this last payment was rent due for June 1961), and during this period Harold Ellison and Fielder, relying in part, with Royal Shields' consent, on equipment belonging to Van Kleeck,[5] attempted to put the Froz-O-Log machine in operation. This effort was unsuccessful; in fact the machine never worked satisfactorily, although some parts were added and some were remodeled during two years after its delivery. Van Kleeck, however, did not complain to Skaggs, or even notify Skaggs[6] of the machine's failure, until an attorney for Van Kleeck by letter dated October 18, 1961, informed Skaggs that the machine was inoperable and that Van Kleeck would not pay any more rent until Skaggs "placed the machine in operating status." Skaggs demand-ed that rent payments be continued but Van Kleeck refused.

Eighteen months later, the James C. Hale Co. which had built one of the machine's units repossessed the unit under claim of a conditional sales contract allegedly breached by Western Frozen Products. Van Kleeck did not inform Skaggs of this repossesion. At trial, appellant introduced evidence which tended to show that Skaggs did not hold a clear title to other parts of the machine.

On June 11, 1963, Skaggs' successor, Transamerica Leasing Corp. (by the time of trial), invoked the default acceleration clause of the lease and sued Van Kleeck for the entire sum of the lease agreement (less ten months rental already paid). Judgment was for Transamerica. This appeal by Van's Realty Co., as successor to Van Kleeck Creamery, is from that judgment.

■ The assigments of error raise four issues on this appeal:

*First,* whether the machine's inoperability constituted a failure of consideration by the lessor sufficient to excuse lessee from its obligation to pay rent?

*Second,* whether the officials of the machine's builder, Western Frozen Products, acted as agents of the lessor in such manner as to charge the lessor with any defects in the machine's construction?

*Third,* whether the lessor's lack of full and clear title to all the machine's component

---

5. The testimony of Royal Shields, on cross-examination, contains the following:
   "Q As I understand your direct examination you worked with them in various modifications in attempting to take and get it up to capacity?
   "A After we had it in place, prior to that time I didn't know anything about it. After that time they occasionally used part of our equipment.
   "Q With your consent Mr. Shields?
   "A Yes."

6. Regarding notice to Skaggs of the machine's inoperability, it should be noted that an undated, handwritten letter from Shields to Skaggs Utah Leasing Co. was sent either during May or August 1961, (Shields testified that he did not know which time was correct), enclosing two past due payments for rent, which referred to an arrangement between Van Kleeck and Western Frozen Products whereby Western had to "take care of lease payments until their machine was in working order." The letter inferred that the machine had not yet been placed in operation.

parts · bars its suit to enforce the lessee's duty to pay rent?

*Fourth,* whether lessor warranted, expressly or impliedly, the efficient operation of the machine?

*FIRST.* Appellant's contention that the machine's failure to operate constituted a complete lack of consideration by Skaggs was apparently not presented to the trial court, for the findings and appellant's motion to amend them are silent in this respect. Upon examining the transaction, however, adequate consideration to support the lease is readily found. Van Kleeck desired equipment which Western Frozen Products, so it was thought, could build. Skaggs provided the money which enabled construction of the machine with which Van Kleeck expected to accomplish its aim of expanded production. The consideration which flowed from Skaggs to Van Kleeck was Skaggs' promise to pay Western $35,000 to induce it to build a machine "in accordance with the requirements of Van Kleeck Creamery, Inc., and to their satisfaction," and Skaggs' satisfaction of that promise was when it paid Western $30,000 balance due upon completion of construction as evidenced by Van Kleeck's letter of acceptance ("the Froz-O-Log ice cream bar machine called for under this lease has been delivered to and accepted by us").

*SECOND.* Appellant draws support for its argument that Western acted for Skaggs and was its agent primarily from two circumstances: Western's officers presented the unsigned lease to Van Kleeck's manager for his signature; and a letter sent by Skaggs after the lease was signed "authorized" Western to construct the machine.

Regarding presentation of the lease, the instrument is a printed form and permitted no change unless in writing and executed "by a duly authorized officer" of Skaggs. North, Skaggs' manager, testified that Western's officers were never authorized to act for Skaggs, while appellant introduced no evidence to the contrary. There is no evidence that Shields, Van Kleeck's manager, ever considered Western's officers to be agents of Skaggs.

Skaggs' letter "authorizing" construction when read as a whole is merely a statement confirming Skaggs' promise to pay Western for building the machine which Van Kleeck desired. It does not suggest an agency relationship.

The burden of proving agency is upon the party who asserts it. Haywood v. Yost, 72 Idaho 415, 431, 242 P.2d 971, 981 (1952). The trial judge was not in error when he found, "the preponderance of the evidence negatived the existence of any agency relationship" between Western and Skaggs "and that at no time did Western * * * or its agents or employees act as agent for Skaggs."

*THIRD:* Appellant argues that Skaggs' breach of an express warranty of title must bar respondent's suit for rent payments. The warranty states:

"Lessor [Skaggs] covenants it is the owner of the Equipment free of encumbrances and that as long as Lessee [Van Kleeck] shall not be in default, Lessee shall peacefully and quietly hold and possess the Equipment during the term hereof. Title to the Equipment shall at all times remain in the Lessor."

The facts upon which appellant bases this contention are a repossession of part of the machine which occurred one and one-half years after Van Kleeck's formal refusal to pay rent, and evidence indicating that another component, then still resting undisturbed in Van Kleeck's Creamery, was held under conditional sale claim. The trial judge found appellant's argument immaterial since the warranty assures peaceful possession only "as long as Lessee shall not be in default," but repossession did not occur (nor did appellant allege that any was threatened) until long after Van Kleeck refused to continue paying rent.[7]

---

7. "The court further finds that plaintiff's contention of failure of title to portions of

the machinery is not material to the issues herein in that the lease agreement

Appellant urges that the finding was error, contending that "mere potential disturbance" of a title warrantee—lessee's possession due to existing conditional interests of a third party is sufficient in itself to relieve the lessee's rental obligation. For support, appellant cites two cases, Alberti v. Jubb, 204 Cal. 325, 267 P. 1085 (1928) and Hollywood Plays v. Columbia Pictures Corp., 299 N.Y. 61, 77 N.Y.S.2d 568, 85 N.E.2d 865, 10 A.L.R.2d 722 (1947). Both cases, which of course are not controlling authority, involve contracts for complete transfer of title and each was a suit for rescission brought by the purchaser either before delivery of the subject matter (Hollywood Plays) or shortly thereafter (Alberti). These cases are both fundamentally different from the present controversy: here title was to remain in Skaggs, Van Kleeck being guaranteed only peaceful possession until default; Van Kleeck did not seek to rescind before or soon after the contract's execution, but rather after delivery, acceptance, and undisturbed dominion for fifteen months before and eighteen months after default, it raised doubtful title as a defense to respondent's suit for unpaid rent.

The trial court thus committed no error by finding that questions regarding defects in Skaggs' title of the machine were immaterial to the issues framed by the facts of this case.

FOURTH. Appellant contends that Skaggs, both impliedly and expressly, warranted the machine's quality and fitness to Van Kleeck. The implied warranties, appellant argues, arose upon leasing the machine with general knowledge of its intended use and from the equipment's indentification in Schedule "A" of the lease; the express warranties, it claims, stem from the lease's term "extend[ing] all vendor's warranties," and from the circumstance that the lease was signed by Van Kleeck concurrently with franchise agreements between it and Western which contained supposed warranties from Western to Van Kleeck.

I.C. § 64–115 [8] creates an implied warranty of fitness for a particular purpose when the seller [9] should know the purpose "and it appears that the buyer relies on the seller's skill or judgment." I.C. § 64–115(1). An implied warranty of "merchantable quality" arises upon purchase by description "from a seller who deals in goods of that description." I.C. § 64–115(2). Implied warranties of fitness or merchantability, therefore, essentially depend upon the buyer's reliance, or his reason to

provides that the plaintiff's predecessor covenanted that it was the owner of the equipment and as long as the lessee was not in default of the lease, the lessee should peaceably and quietly hold and possess the equipment during the term of the lease. Repossession of portions of the machinery claimed by Van's occurred after Van's had defaulted under the lease agreement in failing to make the payments provided therein."

8. "64–115. *Implied warranties of quality.*—Subject to the provisions of this law and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"1. Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or

judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"2. Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"* * *."

9. The transaction here was of course, a lease, not a sale. Some courts have held that the Uniform Sales Act's implied warranties (§ 15 of the Uniform Sales Act is I.C. § 64–115) do not apply to lease transactions. See Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Colum.L.Rev. 653, 657 to 660 (1957), and cases cited. Due to the disposition of the present case, this distinction need not be considered.

rely, on the seller's real or pretended familiarity with the item sold. Cf. McMaster v. Warner, 44 Idaho 544, 258 P. 547 (1927); see also Farnsworth, Implied Warranties in Non Sales Cases, 57 Colum.L.Rev. 653, 655–660, 669–670 (1957); Uniform Commercial Code § 2–314(1) and comment 2, § 2–315 and comments 1, 4 and 5. Thompson Lumber Co. v. Cozier Container Corp., 80 Idaho 455, 333 P.2d 1004 (1958), cited by appellant, is not contrary, for there Thompson (lessor) had owned and operated the leased diesel engine for five years before renting it to Cozier. See Idaho Sup. Ct.Tr. #8582. Case authorities regarding implied warranties cited[10] in Thompson Lumber Co. each contain the element of seller's expertise. This is also true of the other pertinent cases cited by appellant: Koser v. Hornback, 75 Idaho 24, 265 P.2d 988, 44 A.L.R.2d 1015 (1954) (guest ranch owner leases allegedly dangerous horse; suit grounded in negligence); J. I. Case Credit Corp. v. Andreason, 90 Idaho 12, 408 P.2d 165 (1965) (purchaser advised seller of purpose and "relied upon Titensor's [seller, d/b/a Lewiston Implement Corp.] knowledge as a dealer" for choice of an appropriate machine); Brown v. Chapman, 304 F.2d 149 (9 Cir.1962) (purchase of hula skirt from Hawaiian gift shop; evidence that saleslady represented skirt, which subsequently caught fire, as fireproof [see trial court opinion, 198 F. Supp. 78, 85 (D.Hawaii 1961)]); Grey v. Hayes-Sammons Chemical Co., 310 F.2d 291 (5 Cir. 1962) (chemical manufacturer of insecticides allegedly made defective weed killer which destroyed crops). The trial judge, therefore, properly found that no implied warranty of fitness or merchantability was created by the lease transaction in the present case.

■■ If a lease effects a "sale of goods by description" without I.C. § 64–114,[11] it creates an "implied warranty that the goods shall correspond with the description." Appellant contends that the Schedule "A" reference to an "Automatic Froz-O-Log Ice Cream Bar Machine" is a sufficient description to raise an implied warranty of description under this statute. A simple identification, however, which does not embody an affirmation or promise regarding performance will not raise an implied warranty of "sale by description." See Nettleton v. Sedy Bros., Inc., 66 Wash.2d 926, 403 P.2d 671 (1965); Williston, Sales § 205(a) (3d ed. 1948).[12] In the present circumstances, Schedule "A" must be interpreted as identification, perhaps for security, rather than "description" within I.C.

10. In Tufts v. Verkuyl, 124 Mich. 242, 82 N.W. 891 (1900), the seller was apparently a Boston dealer in fixtures with agents in Detroit, Mich., where the buyer operated. Collette v. Page, 44 R.I. 26, 114 A. 136, 18 A.L.R. 74 (1921), concerns a "public garage keeper who lets automobiles for public hire." In Hoisting Engine Sales Co. v. Hart, 237 N.Y. 30, 142 N.E. 342, 31 A.L.R. 536 (1923), the lessee described the job to be performed to the lessor, a dealer in heavy construction equipment, and the lessor responded, "I have got a rig that you can use." Marcos v. Texas Co., 75 Ariz. 45, 251 P.2d 647 (1952), concerns an oil company which leased a service station with a defective gas tank. And in Gagne v. Bertran, 43 Cal.2d 481, 275 P.2d 15 (1954), an experienced soil fill tester was sued for his negligent study of land's ability to support a building.

11. "64–114. *Implied warranty in sale by description.*—Where there is a contract to sell or a sale of goods by description there is an implied warranty that the goods shall correspond with the description and if the contract or sale be by sample, as well as by description, it is not sufficient that the bulk of the goods corresponds with the sample if the goods do not also correspond with the description."

12. In § 205(a), Williston states: "Where the bargain relates to specific goods, which are known to the buyer, words which can properly be understood only as stating in the bargain what are the specific goods on which the parties have agreed, not as stating directly or indirectly some fact about them as an inducement to the purchase, may create no warranty. The reason for this is not because the words are descriptive, but because the buyer does not rely on the description as a basis for his purchase." See also Id., §§ 205 and 225.

§ 64–114. Van Kleeck and Western having agreed on their venture before Skaggs offered the lease, no inducement was needed, and since Skaggs was understood to be a stranger to the mechanics of the new device, it is evident that Van Kleeck did not rely on Schedule "A", as an assurance of operability. It must be concluded that by Schedule "A" no implied warranty by description was intended or understood.

■■■ Appellant also contends that Skaggs expressly warranted the machine's quality and fitness. Supporting this argument, appellant notes that the lease was signed concurrently with the franchise and further franchise option agreements between Western and Van Kleeck, and that a term of the lease "extend[ed]" vendor's warranties. Assuming that the franchise contracts were understood by Van Kleeck to contain warranties by Western, nevertheless, the mere fact that the documents were signed together does not indicate that the franchise papers' promises made by Western, the builder and franchise holder, bind also the lessor, Van Kleeck. See J. I. Case Credit Corp. v. Andreason, supra; Commercial Credit Equip. Corp. v. Knowlton, 86 Idaho 314, 386 P.2d 370 (1963); see also United States ex rel. Adm'r of the F.H.A. v. Troy-Parisian, Inc., 115 F.2d 224 (9 Cir. 1940). Regarding the lease's term which "extend[s] all vendor's warranties," it should first be noted that there is no "vendor" here since Western only built the machine. If, however, Western be termed "vendor" (respondent apparently accepts appellant's assumption that the word refers to Western), study of the record discloses no express warranty made Van Kleek or the lessor, Skaggs, by Western. A statement may become an express warranty only "if [its] natural tendency * * is to induce the buyer to purchase the goods and if the buyer purchases the goods relying thereon." I.C. § 64–112,[13] see Tomita v. Johnson, 49 Idaho 643, 290 P. 395 (1930). The facts here disclose that Van Kleeck and Western considered the new machine an experiment and knew that as such its operation was not, susceptible of guarantee. Cf. Tomita v. Johnson, supra. The "extension" clause is part of a form lease and was not tailored to this specific transaction. Its meaning, sandwiched as the clause is between two precise statements of understanding that the lessor-lessee contract contains no performance representations,[14] may not be completely clear, but no error appears in the trial judge's finding that "the intent of the agreement when considered as a whole did not bind plaintiff [Skaggs] as concerns any warranties."

■■■ A contract embodies the intent of its makers and the court must first strive to discover that intent, scrutinizing where necessary the circumstances surrounding the contract's formation, in order to enforce properly the parties' true agreement. Rudeen v. Howell, 76 Idaho 365, 283 P.2d 587 (1955); cf. Wohlschlegel v. Holst, 81 Idaho 470, 346 P.2d 1051 (1959).

The judgment is affirmed. Costs to respondent.

TAYLOR, C. J., SMITH and McFADDEN, JJ., and DUNLAP, District Judge, concur.

13. "64–112. *Express warranty defined.*— Any affirmation of fact or any promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon. No affirmation of the value of the goods, or any statement purporting to be a statement of the seller's opinion only shall be construed as a warranty."

14. Terms 15 and 17 partially quoted near the beginning of this opinion.