Chris CHILDS, Plaintiff,

v.

**MEADOWLANDS BASKETBALL ASSOCIATES, d/b/a New Jersey Nets, Defendant,**

and

**National Basketball Association, Intervenor.**

Civil Action No. 95–6126.

United States District Court, D. New Jersey.

Feb. 4, 1997.

George G. O'Brien, Cherry Hill, NJ, for Plaintiff.

Jack Wenik, Sills Cummis Zuckerman Radin Tischman Epstein & Gross, P.A., Newark, NJ, for Defendant Meadowlands Basketball Associates.

David W. McGregor, Proskauer Rose Goetz & Mendelsohn, Clifton, NJ, for Defendant National Basketball Association.

## OPINION

HAROLD A. ACKERMAN, District Judge:

This matter is before the court on motions by defendant Meadowlands Basketball Associates, d/b/a New Jersey Nets ("Nets") and by defendant National Basketball Association ("NBA") to dismiss plaintiff Chris Childs' complaint, or to compel arbitration. For the following reasons, the defendants' motions are denied in part and granted in part.

## I. FACTUAL BACKGROUND

Plaintiff Chris Childs is a professional basketball player. Complaint ¶2. He resides

in, and is a citizen of the state of Idaho. Complaint, at 1. The defendant New Jersey Nets is a professional basketball team and is a partnership of the state of New Jersey. *Id.* Because the amount in controversy exceeds $50,000 and because the plaintiff's citizenship is diverse from that of the defendant, this court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

The New Jersey Nets employed Childs as a professional basketball player during the 1994–1995 basketball season. Complaint, ¶ 2. During the 1994–1995 season, Childs received as salary $150,000, the minimum salary in the National Basketball Association ("NBA"). Complaint, ¶ 8. Steven A. Kauffman, Esq. is Childs' certified player agent. Complaint, ¶ 6.

The NBA imposed a lockout against its players after the collective bargaining agreement between the parties expired. *See* Complaint ¶ 11. During the lockout, on August 7, 1995, Childs received an offer to play basketball for the Panionios Sporting Club ("Panionios"), a professional basketball team in the Greek Basketball Federation ("GBF"). Complaint, ¶ 9. The Panionios offered Childs the United States equivalent of between $650,000 and $700,000 to play basketball in the GBF. *Id.* However, after consulting with the Nets, Childs rejected the Panionios' offer. Complaint, ¶ 13.

Childs' agent Kauffman informed the Nets General Manager, Willis Reed, of the terms of the offer. Complaint, ¶ 11. Reed expressed the Nets' intention to re-sign Childs for the 1995–1996 season, and acknowledged that the Panionios' offer was appropriate for a player of Childs' caliber. *Id.* However, Reed also explained that the Nets could not sign Childs immediately because the NBA's "lock-out" of its players was still in effect, i.e., on August 7, 1995. *Id.* "Reed assured Kauffman, however, that after the lock-out was lifted, the Nets would promptly resign Childs to a contract that was as financially attractive as the Panionios offer." Complaint, ¶ 8.

The NBA's lock out of its players was lifted on September 18, 1995. Complaint,

¶ 14. However, when Kauffman approached Reed to negotiate a contract for Childs, "the Nets refused to offer Childs a contract that was as financially attractive as the Panionios offer." Complaint, ¶ 15. At this point, after the lock-out had ended, it was too late for Childs to accept the Panionios' earlier offer. Complaint, ¶ 16.

Due to the restrictions of the salary cap in the NBA, the Nets were able to offer Childs only a one year contract for $350,000. Complaint, ¶ 16. Childs claims that he was forced to accept the offer because he had no other choices. Complaint, ¶ 17.

## II. DISCUSSION

Childs' complaint alleges four state-law grounds for relief against the Nets. First, Childs claims that Reed committed fraud in falsely claiming that the Nets would match the Panionios's offer. Second, Childs claims that Reed made negligent misrepresentations during the contract negotiations. Third, Childs claims that Reed and the Nets intentionally interfered with Childs' prospective economic advantage. Finally, Childs claims that the actions of Reed and the Nets in this action constituted breach of contract. As a result of all of the foregoing, Childs claims that he is entitled to damages in excess of $100,000.

Soon after Childs filed his complaint, the Nets filed a motion to either dismiss the action or to compel arbitration. In addition to their briefs and arguments, the Nets submitted affidavits in support of their motion. While this motion was pending, the NBA filed a motion to intervene in this action, which was eventually granted as unopposed by U.S. Magistrate Judge Stanley R. Chesler. The NBA also submitted briefs and affidavits in support of the motion to dismiss or to compel arbitration.

### A. *The Motion to Dismiss on Preemption Grounds*

■ The Nets argue that Childs' state law contract claims are preempted by § 301 of the Labor Management Relations Act ("LMRA").[1] According to the defendants,

---

1. The NBA has stated that it joins in the Nets'     motion to dismiss pursuant to § 301. *See* Memo-

Childs' state law claims are substantially dependent upon an analysis of the terms of the collective bargaining agreement which the Players Association entered into with the NBA. Specifically, the defendants contend that Childs' claims involving oral agreements and detrimental reliance on his behalf require an interpretation of the CBA's prohibition against oral agreements. Moreover the defendants argue that the resolution of Childs state law claims would depend upon an analysis of Childs' contract with the Nets, which specifically incorporates provisions of the CBA.

The Nets quote *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1915–16, 85 L.Ed.2d 206 (1985), for the proposition that state law claims must either be treated as § 301 claims or must be dismissed as preempted by federal labor law where resolution of the state law claims is dependent upon analysis of the CBA. On the instant motion, the defendants contend that Childs' claims must be dismissed.

The Nets acknowledge, however, that the NBA and the Players Association have not yet reached an agreement on a final version of the collective bargaining agreement. Nonetheless, the Nets contend that preemption of Childs' claims is still required because the terms of a final CBA can be implied from the parties' conduct. Specifically, the Nets contend that there is clear evidence that the Players' Association and the NBA have acted in accord with an arbitration grievance procedure which was required under the expired CBA. The Nets have submitted affidavits in support of this claim. Notably, however, the Nets have not offered "evidence" of other terms of the CBA, even though the Nets relied in their opening brief, see *supra* at 997, upon specific provisions of the alleged CBA in arguing that specific portions of Childs' state law claims required interpretation of the CBA.

I will not express an opinion at this time on the defendants' motion to dismiss on preemption grounds. Resolving the defendants'

arguments would involve a consideration of affidavits and other evidence submitted on this motion. However, in ruling upon a motion to dismiss, it is well settled that a court must restrict its consideration to only those matters alleged in the complaint, exhibits attached to the complaint and matters of public record. *Pension Benefit Guaranty Corp. v. White Consolidated Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 655 (1994).

I acknowledge that I could convert the motion to dismiss to a motion for summary judgment. *See* Fed.R.Civ.P. 12(b) (permitting court to convert Rule 12(b)(6) motion to motion for summary judgment). The decision to convert a motion to dismiss into a summary judgment motion is entrusted to the district judge's discretion. *See Kulwicki v. Dawson,* 969 F.2d 1454, 1463 (3d Cir.1992) (citing 5A Wright & Miller, *Federal Practice & Procedure,* § 1366, at 491 (1990)). However, after reviewing the parties' submissions on this motion, I have decided in my discretion to refrain from converting the instant motion into a summary judgment motion. I have not been advised whether any discovery has taken place in this case and I note that the plaintiff appears to be experiencing difficulties in obtaining potentially crucial discovery from the defendants. *See* Certification in Opposition to Defendant's Motion to Dismiss or Compel Arbitration, at 2. In these circumstances, I believe that it would be inappropriate for the court to convert the pre-answer motion to dismiss into a motion for summary judgment.[2]

Accordingly, the defendants' motion to dismiss on preemption grounds, which relies on matters outside the pleadings and has not actually been briefed as a motion to dismiss, is denied.

### B. Motion to Compel Arbitration

The defendants also argue that Childs' claims must be submitted to arbitration, even

---

randum of the National Basketball Association in Support of the Motion to Dismiss or Compel Arbitration, at 10 n. 2.

2. Moreover, it is my policy, in accord with Fed. R.Civ.P. 56(f), to defer ruling on motions for summary judgment until discovery has been closed.

if this court does not conclude that his claims are preempted. In support of this argument, the defendants rely upon the terms of the contract which Childs entered into with the Nets following Willis Reeds' alleged misrepresentations. That contract provides:

> In the event of any dispute arising between the Player and the Club relating to any matter arising under this contract, or concerning the performance or interpretation thereof (except for a dispute arising under paragraph 9 hereof), such dispute shall be resolved in accordance with the Grievance and Arbitration Procedure set forth in the NBA/NBPA Collective Bargaining Agreement.

See Affidavit of Ray Schaetzle (filed Apr. 29, 1996), at Ex. B (containing copy of Childs' 1995 contract).[3] Furthermore, Childs' contract contains an integration clause:

> This contract (including any Exhibits hereto) contains the entire agreement between the parties ... and there are no undisclosed agreements of any kind, express or implied, oral or written, promises, undertakings, representations, commitments, inducements, assurances of intent or understandings of any kind that have not been disclosed to the NBA ... involving consideration of any kind to be paid, furnished or made available to the Player....

Id. The defendants argue that Childs' complaints against the Nets and Willis Reed is a matter "arising between the Player and the Club relating to any matter arising under [the] contract, or concerning the performance or interpretation" of the contract, and must therefore be submitted to arbitration.

**3.** I note parenthetically that, unlike the standard of review on a motion to dismiss for failure to state a claim, *supra*, I am not confined to an analysis of plaintiff's complaint in ruling upon a motion to compel arbitration. *See Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.*, 636 F.2d 51, 54 (3d Cir.1980) (analogizing standard of review in motion to compel arbitration to that utilized in addressing summary judgment motions).

The parties do not dispute that the language quoted in the text is contained in Childs' contract.

**4.** I am cognizant that some of the cases I rely upon herein focus upon interpretations of the Federal Arbitration Act ("FAA"). Section 1 of

▪ When deciding whether a matter must be submitted to arbitration, courts must make essentially two inquiries: (1) whether the parties agreed to arbitrate their claims; and (2) whether the specific dispute falls within the scope of the arbitration agreement. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626–28, 105 S.Ct. 3346, 3353–55, 87 L.Ed.2d 444 (1985). These questions must be answered by the court; parties cannot be directed to arbitrate the question of whether a dispute is arbitrable, unless they explicitly agree otherwise. *Id.; AT & T Technologies v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *see also First Options of Chicago v. Kaplan*, 514 U.S. 938, –––– ––––, 115 S.Ct. 1920, 1923–24, 131 L.Ed.2d 985 (1995).

▪ In making these required determinations, courts must keep in mind the federal policy favoring arbitration of disputes. *Moses H. Cone Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). Federal law favors the arbitration of disputes where the parties have so provided, especially within the context of labor relations. *See Farmland Dairies, Inc. v. Milk Drivers & Dairy Employees Union*, 956 F.Supp. 1190 (D.N.J.1997). Where a contract contains an arbitration clause, a presumption of arbitrability arises, which can be overcome only if the court can determine with positive assurance that the clause does not cover the dispute at issue. *AT & T Technologies*, 475 U.S. at 650, 106 S.Ct. at 1419.[4]

the FAA provides that the act is inapplicable to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Courts have split on the question of whether this provision entirely precludes application of the FAA to employment contracts. *See, e.g., Crawford v. West Jersey Health Sys.*, 847 F.Supp. 1232, 1240–42 (D.N.J.1994). *But see Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064 (2d Cir.1972) (rejecting basketball player's argument that § 1 precluded application of the FAA to his arbitration agreement, where the court concluded that § 1 applied only to those actually in the transportation industry and the basketball player was not in the transportation industry). The Supreme Court has specifically left this question open. *Gilmer v. Inter-*

In this case, Childs does not dispute the existence of his contract with the Nets, or of the arbitration clause contained therein. Moreover, Childs does not dispute, or in any way controvert, the Nets and the NBA's claims that the NBA and the Players' Association have been acting in accord with a modified form of the arbitration provision contained in the 1988 CBA, even though a formalized, written CBA has not been completely agreed upon. Nonetheless, Childs appears to argue that the arbitration provision is invalid because that provision of his contract "hinges" upon the existence of the arbitration provision specified in the CBA, but there was no CBA in existence when he signed his contract with the Nets.

I disagree with Childs' conclusory argument. My analysis of the arbitration clause in his Players Contract indicates that the parties clearly intended to submit their disputes to arbitration, and did not condition the arbitrability of their disputes upon the existence of a fully executed, formally written CBA. *See Mitsubishi Motors Corp.,* 473 U.S. at 626, 105 S.Ct. at 3354 ("As with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability."). Moreover, I find it significant that Childs has not denied, or in any way controverted the extensive explanations by both the NBA and the Nets that there is, indeed, an agreed upon arbitration procedure currently in place between the NBA and the Players' Association. *See Luden's Inc. v. Local Union No. 6,* 28 F.3d 347 (3d Cir.1994) (noting that employer and a union "may adopt an enforceable labor contract without reducing the agreement to writing, and that what really is crucial is 'conduct manifesting an intent to be bound by agreed-upon terms.'") (quoting *Mack Trucks, Inc. v. International Union, UAW,* 856 F.2d 579, 592 (3d Cir.1988), *cert. denied,* 489 U.S. 1054, 109 S.Ct. 1316, 103 L.Ed.2d 585 (1989)). This apparent agreement between the parties, together with the rather clear language of the arbitration clause in Childs contract with the Nets convinces me that the parties agreed to arbitrate their respective contract claims.[5]

I therefore reject Childs' conclusory argument regarding the arbitration clause's validity. I find that the parties clearly intended to arbitrate their disputes under the contract, even if the precise terms of a formal CBA had not yet been formalized. A valid agreement to arbitrate exists in this case, and I so find.

Nonetheless, I must still determine whether the specific dispute at issue falls within the scope of the arbitration agreement. *Mitsubishi Motors Corp.,* 473 U.S. at 626–28, 105 S.Ct. at 3353–55. Childs argues that the arbitration clause is inapplicable to this case because the clause, by its very language, applies only to matters which arise

---

*state/Johnson Lane Corp.,* 500 U.S. 20, 25 n. 2, 111 S.Ct. 1647, 1651 n. 2, 114 L.Ed.2d 26 (1991).

However, regardless of the answer to this question, it is clear that courts have relied upon constructions of arbitration contracts under the FAA as guides towards interpreting arbitration clauses in employment contracts. *See United Paperworkers International Union, AFL–CIO v. Misco,* 484 U.S. 29, 40 n. 9, 108 S.Ct. 364, 372 n. 9, 98 L.Ed.2d 286 (1987) (citing *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123 (3d Cir.1969)) (other citations omitted). I agree with this approach and will follow it in this case.

5. I am further persuaded that the parties did not intend to condition the arbitrability of their claims upon the existence of a formalized CBA by the fact that such document was not in existence at the time the parties executed the contract which contained the arbitration clause at issue. *See, e.g., Communications Workers v. Monmouth Co. Bd.,* 96 N.J. 442, 452, 476 A.2d 777

(1984) ("[T]he circumstances that existed when the contract was made" may shed light on the parties' intention). *See also Transamerica Leasing Corp. v. Van's Realty Co.,* 91 Idaho 510, 427 P.2d 284, 294 (1967) ("A contract embodies the intent of its makers and the court must first strive to discover that intent, scrutinizing where necessary the circumstances surrounding the contract's formation, in order to enforce properly the parties' true agreement.") (citations omitted). *Cf. Gruntal & Co., Inc. v. Steinberg,* 854 F.Supp. 324, 334 (D.N.J.) (noting that general state law principles are applicable to agreements to arbitrate) (quoting *Volt Information Sciences v. Board of Trustees,* 489 U.S. 468, 475, 109 S.Ct. 1248, 1253–54, 103 L.Ed.2d 488 (1989)), *aff'd,* 46 F.3d 1116 (3d Cir.1994) (Table).

I have included a reference to the law of the State of Idaho because the plaintiff is a resident of that state and there has not yet been a determination in this matter concerning the proper source of law for construing the parties' contract.

under the contract. According to Childs, his dispute with the Nets does not arise under the contract, but instead arises from the misrepresentations that Willis Reed allegedly made to Childs during the NBA's lockout, prior to his contract with the Nets. Childs thus argues that his present dispute arises independently of, and not under the present contract.

Childs' argument is completely unpersuasive. When Willis Reed allegedly made misrepresentations to Childs, those representations were not actionable. It was not until the Nets allegedly dishonored those representations that Childs' cause of action arose. Because the Nets' dishonoring of Reeds' alleged promises could only have occurred in the contract, and because it is an alleged defect in the contract itself (which Childs signed) that forms the basis for Childs' claims, it appears clear, as a factual matter, that Childs' claims arise only under the contract. *See Mutual Benefit Life Ins. v. Zimmerman,* 783 F.Supp. 853, 868 (D.N.J.) ("[T]he focus is on the 'factual allegations in the complaint rather than the legal causes of action asserted.'") (quoting *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.,* 815 F.2d 840, 846 (2d Cir.1987)), *aff'd,* 970 F.2d 899 (3d Cir. 1992).

Moreover, Childs' claims in this action require an interpretation or construction of the integration clause in his contract with the Nets. As noted above, that clause specifies that there are no undisclosed agreements of any kind, express or implied, oral or written ... that have not been disclosed to the NBA ... involving consideration of any kind to be paid, furnished or made available to the Player. Childs' claim that Willis Reed made representations to him, despite the integration clause in the contract, would therefore require a construction or interpretation of the integration clause. Plainly, the parties intended this type of dispute to be resolved through arbitration, as evidenced by the clear language of the arbitration clause requiring arbitration for disputes concerning interpretations of the contract. Accordingly, I conclude that the parties intended to submit the claims at issue in this case to arbitration.

I have determined both that a valid agreement to arbitrate existed between the parties, and that the parties intended for the specific dispute at issue to be arbitrated. Therefore, Childs' claims must be submitted to an arbitrator. *See PaineWebber Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990) ("If ... the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute.").

## III. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss on preemption grounds is denied but the defendants' motion to compel arbitration is granted.