FUNDING SYSTEMS LEASING
CORPORATION, Respondent,

v.

KING LOUIE INTERNATIONAL, INC.,
et al., Appellant.

No. KCD 28435.

Missouri Court of Appeals,
Western District.

June 11, 1979.

Roger W. Penner, Howard D. Lay, Reeder, Griffin, Dysart, Taylor & Penner, P. C., Kansas City, for appellant.

Thomas A. Schwindt, Berman, DeLeve, Kuchan & Chapman, Alvin D. Shapiro, Samuel J. Goldberg, Stinson, Mag & Fizzell, Kansas City, for respondent.

Before SWOFFORD, C. J., and PRITCHARD, DIXON, SHANGLER, WASSERSTROM, SOMERVILLE and CLARK, JJ.

WASSERSTROM, Judge.

This multiparty litigation presents the question of responsibility of the financing party under a lease-purchase agreement for the malfunctioning of the covered equipment. The trial court held the financing party here free of any legal responsibility

for the malfunctioning, and the lessee-purchaser appeals.

In early 1970, King Louie International Incorporated ("King Louie") was the owner of radio station KBEA. It desired to automate the station in order to conserve the cost of manpower. After surveying different types of equipment on the market, King Louie decided in favor of equipment offered by International Good Music, Inc. ("IGM"). IGM presented an Equipment Proposal dated March 30, 1970, as supplemented on April 1, 1970, under which there were cash terms and also terms for a 60 month lease, at the end of which King Louie could acquire title for one dollar. The proposal also contained as one of its terms the following express warranty: "All equipment manufactured by IGM shall carry a full one year warranty after delivery." King Louie by letter dated April 6, 1970, accepted the lease terms and enclosed a check for the down payment. The order was acknowledged by IGM by letter dated April 10, 1970.

IGM did not have any facilities for carrying the financing of the lease agreement itself. Its general practice with respect to such lease-purchase arrangements was to utilize the services of a finance broker, International Financing Incorporated, which in turn did business with some 17 finance companies, each of which tended to specialize in a certain type of equipment and size of transactions. In this particular case, IGM submitted the contemplated King Louie transaction to International Financing on April 1, 1970, concurrently with the submission of its written Equipment Proposal to King Louie. In response to that approach from IGM, International Financing wrote to King Louie on April 15, 1970, requesting signature to various forms which International Financing would need to arrange the necessary financing. At about this same time, International Financing submitted the proposed transaction to Funding Systems Leasing Corporation ("Funding Systems").

Funding Systems submitted its standard lease-purchase forms to King Louie, and discussions then took place between it and Mr. Marvin Rich, attorney for King Louie, concerning certain objections which Rich made to the proposed terms. By letters dated April 24 and April 29, 1970, Funding Systems agreed to certain modifications demanded by Rich, and thereupon King Louie signed the Funding Systems documents, including a lease agreement dated May 7, 1970. The lease term was 60 months, called for monthly payments of $1097.91, and King Louie had an option to buy at the end of the term for one dollar.

This agreement also set out as one of its terms on the front page in capital letters and in red color the following:

"THAT THE LESSEE REPRESENTS THAT LESSEE HAS SELECTED THE EQUIPMENT LEASED HEREUNDER PRIOR TO HAVING REQUESTED THE LESSOR TO PURCHASE THE SAME FOR LEASING TO THE LESSEE, AND LESSEE AGREES THAT THE LESSOR HAS MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, DIRECTLY OR INDIRECTLY, EXPRESS OR IMPLIED, AS TO THE SUITABILITY, DURABILITY, FITNESS FOR USE, MERCHANTABILITY, CONDITION, QUALITY, OR OTHERWISE OF ANY SUCH UNIT. LESSEE SPECIFICALLY WAIVES ALL RIGHTS TO MAKE CLAIM AGAINST THE LESSOR HEREIN FOR BREACH OF ANY WARRANTY OF ANY KIND WHATSOEVER AND AS TO LESSOR, OR LESSOR'S ASSIGNEE, LESSEE LEASES THE EQUIPMENT 'AS IS'. LESSOR AND LESSOR'S ASSIGNEE SHALL NOT BE LIABLE TO LESSEE FOR ANY LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE CAUSED DIRECTLY OR INDIRECTLY BY ANY UNIT LEASED HEREUNDER OR THE USE OR MAINTENANCE THEREOF OR THE FAILURE OF OPERATION THEREOF, OR THE REPAIRS, SERVICE OR ADJUSTMENT THERETO, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY THEREOF, OR BY ANY INTERRUPTION OF SERVICE OR LOSS OR USE THEREOF OR FOR

ANY LOSS OF BUSINESS OR DAMAGE WHATSOEVER AND HOWSOEVER CAUSED."

Immediately following the quoted provisions there also appears the following: "Lessor, Lessor's Successor or Lessor's Assignee shall have no obligation to install, erect, test, adjust or service the equipment. * * * No defect or unfitness of the equipment shall relieve Lessee of the obligation to pay rent or of any other obligation under this Lease * * *." Closely following that, there appears in capital letters and heavy black type: "THIS IS A NON–CANCELLABLE LEASE FOR THE TERM INDICATED ABOVE."

Another of the leasing documents signed by King Louie was a financing statement which was duly filed by Funding Systems with the Secretary of State of Missouri on May 18, 1970. Thereupon Funding Systems made payment by its check dated May 27, 1970, to IGM for the balance of the purchase price due in the amount of $44,520.91. Delivery of the equipment was then made by IGM to King Louie in late May or early June, 1970. (By mistake a small part of the equipment had previously been delivered by IGM to ISC, whose subsidiary Intermedia had entered into a contract in 1969 for the purchase of KBEA from King Louie, contingent upon approval of the Federal Communications Commission.) Sometime soon thereafter, Funding Systems assigned the lease-purchase obligation to Chase Manhattan Bank.

The equipment malfunctioned from the very beginning and failed to perform the purpose of automating the station as intended. IGM however responded promptly to complaints from King Louie and sent engineers to Kansas City who worked diligently at attempting to correct the equipment. Difficulty continued to the point that Rich wrote a letter dated July 15, 1970, addressed jointly to Funding Systems, Chase Manhattan and IGM stating that King Louie "has recently leased some equipment from International Good Music Company through Funding Systems Leasing Corp. This letter is to advise again that the equipment has never functioned properly and continues to malfunction, has never been accepted by the lessee and the lessee will not make any payments in connection with said equipment until the equipment is in the proper condition to carry out the functions for which it was leased."

Sometime in July, 1970, the Federal Communications Commission finally approved the purchase of KBEA by Intermedia who then completed that purchase from King Louie. Thereafter Intermedia made payments under the lease agreement to Chase Manhattan, while IGM continued with its efforts to remedy the defects in the leased equipment. Those efforts were so ineffectual that after a year and a half Intermedia wrote a letter to Chase Manhattan dated December 17, 1971, stating, "This letter is to advise that the payment paid by KBEA Radio on or about December 1, 1971 and due December 7, 1971 will be the last payment made by Intermedia, Inc. d/b/a KBEA Radio until International Good Music gets the automated equipment in satisfactory working condition. * * * This equipment was bought from International Good Music * * * by a lease-purchase arrangement with Funding Systems Leasing Corporation * * *." Despite that letter, IGM continued to attempt to remedy the defects until the summer of 1972 when Intermedia finally gave up, ceased any attempt to use the equipment, and stored it away.

After Intermedia refused to make any further payments, Funding Systems commenced the present suit against King Louie, praying damages for the lease installments unpaid, together with interest, attorneys fees, certain incidental expenses and costs. King Louie filed answer and also a counterclaim based on alleged misrepresentations and breach of warranties, praying rescission of the contract and damages in the sum of $71,958.20. Intermedia intervened in the litigation and filed a counterclaim against Funding Systems alleging the same grounds and asking the same relief as King Louie. King Louie also filed a third-party petition on behalf of itself and Intermedia

against IGM alleging misrepresentations, breach of warranties, claiming rescission and praying damages in the sum of $71,958.20 and for any judgment which might be entered against it in favor of Funding Systems. In response to the claims against it, Funding Systems filed a crossclaim against IGM praying indemnity for any judgment which might be entered against it in favor of King Louie or Intermedia, and further seeking damages against IGM for breach of warranty.

The trial court entered judgment in favor of Funding Systems against King Louie in the sum of $63,485.50; in favor of Funding Systems on the counterclaims of King Louie and Intermedia; against Funding Systems on its claims against IGM; in favor of King Louie against IGM in the sum of $22,862.86; and against Intermedia on its claim against Funding Systems. From that judgment, the sole appeal has been taken by King Louie.

King Louie relies upon the following points: (1) that the trial court erred in finding that Funding Systems was a mere financing agency and not responsible as a merchant under the Uniform Commercial Code; (2) that the court erred in failing to find the lease unconscionable; and (3) that the court erred in limiting King Louie's recovery to only those amounts theretofore paid by King Louie.

■ For King Louie to prevail against Funding Systems, it must establish both of its points 1 and 2. Otherwise stated, the judgment must be affirmed if the trial court's ruling in favor of Funding Systems can be sustained as to either point 1 or point 2. All questions with respect to these two points must be determined under New York law because in the lease agreement it is stated that "said lease shall be interpreted and the rights and liabilities of the parties here determined in accordance with the laws of the state of New York." Such a stipulation is recognized and given effect by Uniform Commercial Code Sec. 1–105.[1]

Funding Systems has no interest in the third point on appeal, that issue being solely between King Louie and IGM. Although the latter appeared and was represented in the trial court, it has filed no brief nor made other appearance in this court.[2]

I.

## APPLICATION OF U.C.C. ARTICLE 2 TO FUNDING SYSTEMS

U.C.C. Sec. 2–314 provides that "a warranty that the goods shall be merchantable is implied in a contract for sale if the seller is a merchant with respect to goods of that kind." Sec. 2–102 further provides that "this Article * * * does not apply to any transaction which * * * is intended to operate only as a security transaction * * *."

The application of the foregoing provisions is affected by the following definitions contained in Sec. 2–104. Subsection (1) defines the term "Merchant" as meaning "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction * * *." Subsection (2) defines the term "Financing agency" as meaning "a bank, finance company or other person who in the ordinary course of business makes advances against goods or documents of title or who by arrangement with either the seller or the buyer intervenes in ordinary course to make or collect payment due or claimed under the contract for sale * *. 'Financing agency' includes also a bank or other person who similarly intervenes between persons who are in the position of seller and buyer in respect to the goods."

King Louie argues that Funding Systems is a "merchant" within the meaning of the above sections and therefore is deemed to

---

**1.** The Uniform Commercial Code has been adopted in New York as McKinney's Uniform Commercial Code Sections 1–101 to 10–105. The pertinent statutory references in this opinion hereafter will be to "U.C.C." or else simply to section number.

**2.** The transcript indicates that IGM at the time of trial was in the process of being liquidated.

have made an implied warranty under Sec. 2–314. Funding Systems argues and the trial court held that it was merely a "financing agency" and therefore does not fall within the scope of Sec. 2–314.

Whether a particular party to any given transaction falls within the scope of the implied warranty provisions of Sec. 2–314 must be determined by looking at the facts and circumstances of each case separately. *Leasco Data Processing Equipment Corp. v. Starline Overseas Corp.,* 74 Misc.2d 898, 346 N.Y.S.2d 288 (1973). See similarly *In Re Sherwood Diversified Services, Inc.,* 382 F.Supp. 1359 (D.C.N.Y.1974); *Atlas Industries, Inc. v. National Cash Register Co.,* 216 Kan. 213, 531 P.2d 41 (1975). Note also U.C.C. Sec. 1–201(37). The controlling facts exonerating Funding Systems were well summarized by the trial court in its findings of fact and conclusions of law, the pertinent ones of which are quoted in the margin.[3] Those findings and conclusions are fully supported by the evidence.

In this situation aptly encapsulated by those findings and conclusions, controlling New York law requires the conclusion that Funding Systems did not occupy a position covered by Sec. 2–314. The governing decision on this point is *Leasco Data Processing Equipment Corp. v. Starline Overseas Corp., supra.* In that case, the plaintiff was a finance company which bought office equipment designated by the defendant and then leased the equipment to the defendant. The defendant paid under the lease for three years and then defaulted, claiming the equipment to be defective. The plaintiff sued for rent due for the balance of the lease term. The New York Supreme Court, Appellate Term, First Department, held that the plaintiff was entitled to recover despite defenses based upon alleged breach of warranty. In this connection and directly applicable to the facts of our case, the court held:

"* * * the express language of the written agreement contradicts any implication that plaintiff was a 'merchant [dealing] in goods of the kind' within the meaning of U.C.C. section 2–104, when it says at paragraph 3, 'lessee requests lessor *to purchase the equipment from a seller* and arrange for delivery which

---

**3.** Findings of fact 25 through 30 state:

"25. Funding Systems is in the business of providing financing for the leasing of equipment in general.

26. Funding Systems is not in the business of buying and selling equipment in general.

27. Funding Systems maintained no warehouse for the equipment described in the lease.

28. No evidence was introduced by King Louie to show that affirmations of fact or promises were made by Funding Systems to King Louie concerning the equipment described in the lease.

28(a) No affirmations of fact or promises were made by Funding Systems to Intermedia, Inc. concerning the equipment described in Lease No. 0403083.

29. IGM installed the equipment described in the lease.

30. No evidence was introduced by King Louie to show that King Louie ever looked to Funding Systems to repair or maintain said equipment."

Conclusions of law numbers 1, 3, 5, 6, 7, 10 and 11 are as follows:

"1. The lease agreement of May, 1970 between Funding Systems and King Louie (and a letter dated April 24th, 1970, to Victor Lerner from James C. Larson) constituted the only lease-contract between Funding Systems and King Louie. This lease-contract was solely a financing mechanism intended for security.

3. Funding Systems performed all of its obligations under the lease-contract with King Louie.

5. Funding Systems was by the terms of the lease-contract a financing agency under Section 400.2–104(2) V.A.M.S.

6. Funding Systems was not a merchant under Section 400.2–104(1) V.A.M.S., with respect to King Louie and the goods described in the lease.

7. Funding Systems made no express or implied warranties of merchantability or fitness to Intermedia, Inc. nor to King Louie concerning the equipment described in the Lease No. 0403083.

10. The arrangement between Funding Systems and King Louie was purely and strictly a financial one by which Funding Systems advanced the money so King Louie could and did, without a large capital outlay, obtain the use of the equipment.

11. The transaction between Funding Systems and King Louie was not one in goods but rather a transaction in money, thus being outside the scope of Section 400.2–101 et seq. (Missouri laws governing the sale of goods), because of Section 400.2–105(1) and 400.2–102 V.A.M.S."

shall be deemed complete upon arrival at Lessee's premises * * *' (Emphasis supplied). Defendant's selection of the specified machine was prompted by the recommendation of a friend, in no way connected with plaintiff or the manufacturer. A representative of the manufacturer or merchant dealing in these machines, was consulted by defendant's president before entering into the leasing agreement with plaintiff.

"A proper construction of the written leasing agreement must find it to be a 'title retention contract and lease * * intended as security' within the meaning of U.C.C. 9–102(2), designed to afford defendant the advantage of having the possession and use of its own free choice of a particular machine throughout its usable expectancy, by means of long-term installment payments of $274.20 per month without the large, initial outlay of $13,710 necessary to outright purchase.

"Section 1–201(37) of the Uniform Commercial Code defined 'security interest' as 'an interest in personal property * * which secures payment * * of an obligation.' And goes on to say 'whether a lease is intended as security is to be determined by the facts of each case; however * * an agreement that upon compliance with the terms of the lease the lessee * * has the option to become the owner of the property * * for a nominal consideration does make the lease one intended for security.'

"The lease in this case, as has been noted above, provided the defendant with an option to renew for a trifling yearly rental which for all practical purposes amounts to making defendant owner of the machine at the end of the lease for a nominal consideration until total obsolescence.

"Article 2 of the Uniform Commercial Code—(Sales), at section 2–102, expressly excludes from the application of its provisions (sec. 2–101 to and including sec. 2–725 U.C.C.) 'any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction * * *'."

The above decision in *Leasco* has been followed in a number of other jurisdictions. *Leasco* was directly cited in *In Re Sherwood Diversified Services, Inc., supra,* and *Atlas Industries, Inc. v. National Cash Register Co., supra. Atlas* in turn was cited and followed in *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc.,* 454 F.Supp. 511 (D.C.Okl.1977). Other authorities refusing to hold a financier in a third-party equipment lease subject to Sec. 2–314 are *All-States Leasing Co. v. Bass,* 96 Idaho 873, 538 P.2d 1177 (1975); *Northwest Collectors, Inc. v. Gerritsen,* 74 Wash.2d 690, 446 P.2d 197 (1968); *Transamerica Leasing Corp. v. Van's Realty Co., Inc.,* 91 Idaho 510, 427 P.2d 284 (1967); *Brescia v. Great Road Realty Trust,* 117 N.H. 154, 373 A.2d 1310 (1977). See also Hawkland, "The Impact of the Uniform Commercial Code on Equipment Leasing," U.Ill.L.Forum, 1972, p. 446, l. c. 460.

King Louie seeks to escape the force of the *Leasco* opinion by misinterpreting the instant transaction as being essentially a two-party sale from IGM to King Louie, with Funding Systems coming into the picture by later substitution in the nature of a novation. If that were true, then King Louie's argument would have validity, because Funding Leasing would be in the position of an assignee who is heir to all the defenses to which his assignor is subject. *Fairfield Lease Corp. v. Umberto,* 7 U.C.C. Rep.Serv. 1181 (1970).[4] That, however, does not correctly reflect what happened here.

4. Because the instant case does not involve assignment, the many cases cited by King Louie arising out of a simple two-party lease are inapplicable. *Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House,* 59 Misc.2d 226, 298 N.Y.S.2d 392 (1969), upon which King Louie heavily relies, may fall into that two-party category, but this cannot be determined from the opinion. Regardless of that, *Hertz* is of no value because the Civil Court opinion cited was reversed on procedural grounds by the Supreme Court, Appellate Term, First Department, 64 Misc.2d 910, 316 N.Y.S.2d 585 (1970), which held that the Civil Court should not have reached the questions of law regarding the application of U.C.C. Article

The parties from the outset contemplated the very different kind of third party lease-financing which has become a familiar and much used device in American business.[5] Certainly IGM expected its lease-purchase to be accomplished by third-party financing, because it never handled these transactions in any other way and had no capacity for handling the financing itself. Furthermore, King Louie knew from the beginning that the financing would be by a third party. As testified by Rich in his deposition which was introduced into evidence: "We originally started out thinking that IGM was going to carry this paper itself, as I recall, there was some conversation, with a sibling company or subsidiary company that purported to be in the leasing or financing business. *We didn't care how IGM chose to finance their arrangements so long as it didn't make any difference in our arrangements with them.*" (Emphasis added).[6] It is also to be observed that King Louie was fully familiar with the usual methods of lease-purchasing, for as Rich testified, King Louie had made all of its major acquisitions (except real estate) by lease-purchase arrangement for at least the past 15 years. It is also to be noted that King Louie's letter to Chase Manhattan dated July 15, 1970, and that of Intermedia dated December 17, 1971, both reflected an understanding that this had been from the outset a standard, classic three-party transaction.

Very tellingly, the timing of the various steps in this transaction demonstrates that it was from its commencement such an integrated three-party financing arrangement.

At the very same time that IGM sent its Equipment Proposal to King Louie, it concurrently wrote to International Financing to get the third-party financing under way. International Financing then very promptly got in touch with King Louie to request the necessary forms signed which would have to be submitted to the financing company, and International Financing did very promptly proceed to submit the proposed transaction for approval to Funding Systems. Funding Systems without any delay then in its turn submitted its documents to King Louie, and negotiations immediately ensued between Funding Systems and Rich with respect to the financing terms. Those discussions were memorialized by written correspondence between Funding Systems and Rich as early as April 24, 1970. The lease agreement itself soon followed on May 7, 1970, with filing of the finance statement in Jefferson City on May 18, 1970, and by Funding Systems' payment to IGM on May 27, 1970. Very promptly after that payment was received by IGM, it delivered and installed the equipment at KBEA.

The closely interrelated nature of all these steps as part of a single integrated transaction distinguishes this case sharply from *Industralease Automated & Scientific Eq. Corp. v. R. M. E. Enterprises, Inc.,* 58 A.D.2d 482, 396 N.Y.S.2d 427 (1977) upon which King Louie seeks to rely. In *Industralease* a manufacturer, Clean Air, entered into an agreement in February to lease pollution devices to defendants, under which Clean Air assumed warranty obligations. In reliance upon that agreement, defendants proceeded to install preliminary

2, thereby in effect vacating that part of the Civil Court opinion relied on by King Louie.

5. A two-party lease is quite practical when the seller-lessor is a large organization with substantial financial resources or when the transaction is relatively small or when credit is extended for only a short period of time. However, when the equipment involved is expensive, the credit period relatively long, and the seller has only limited financial reserves, calling in a third party to supply the financing may be the only way to finance the deal. A full thirty percent of the equipment leases is attributed to such third-party transactions with banks and finance companies. This type of lease business has been described as "the fastest growing and most hotly competitive sector of the business." Note, Recording of Equipment Leases, 47 Notre Dame Law. 933, n. 8 (1972).

6. Despite Rich's reference to a "sibling" or "subsidiary," he admitted that he had merely assumed a connection between IGM and Funding Systems and that he had no knowledge of such a relationship. No evidence appears in this record of any common ownership or corporate affiliation of any kind between IGM and Funding Systems.

structures. Then in May, Clean Air together with plaintiff finance company visited upon the defendants, stated to defendants that the February agreement was "no good" and refused to proceed with it, insisting instead that defendants sign new papers containing an unqualified disclaimer of all warranties by either Clean Air or the financing company. That situation was clearly different from our situation. Clean Air had made a completed transaction with defendants in February and it was only after the passage of many months, during which defendants had changed their position, that Clean Air turned up again and wanted to completely change the nature of the obligations.

In contrast, the case at bar involved a three-party transaction from the very beginning, with no attempt to foist any new terms upon King Louie after a prior transaction had been finally completed and after King Louie had made some change of position to its detriment. All the various steps in April and May, 1970, were parts of one total three-cornered transaction, to which there were however two distinct aspects: (1) a sale from IGM to King Louie, as to which IGM made warranties, and (2) financing by Funding Systems advanced on behalf of King Louie, for which it took title to the equipment as a security device.[7] As held in *Leasco,* that second aspect does not carry with it any warranty obligation on the part of Funding Systems.

■ Although not encompassed within any point relied upon as required by Rule 84.04(d), note nonetheless will be taken of the suggestion that even if Funding Systems is exempt from liability under implied

warranty, nevertheless it can be held liable under a theory of failure of consideration. The fundamental difficulty with that argument is that there has been no failure of consideration so far as Funding Systems is concerned—it has furnished and performed all of the consideration which it undertook, which was to advance the necessary purchase price to IGM. The very same argument of failure of consideration was advanced and specifically rejected in: *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc., supra,* 454 F.Supp. at 514; *Bill Stremmel Motors, Inc. v. IDS Leasing Corp.,* 89 Nev. 414, 514 P.2d 654, 656 (1973); *Transamerica Leasing Corp. v. Van's Realty Co., Inc., supra.*

## II.

### THE ALLEGED UNCONSCIONABILITY

Even if it could be said (contrary to what has just been held under part I of this opinion) that Funding Systems can be liable for a breach of warranty or on a theory of failure of consideration, in order to prevail on this appeal King Louie must also overcome the express disclaimer of any such liability which appears on the face of the lease agreement. Such disclaimer is expressly authorized by U.C.C. Sec. 2–316.[8] The disclaimer in the lease agreement here was unquestionably conspicuous, and King Louie makes no contention to the contrary.

King Louie does however undertake to avoid this disclaimer on the ground that it is unconscionable, in violation of U.C.C. Sec. 2–302.[9] The code itself does not set forth any definition of "unconscionability." A test for measuring this concept has however been suggested by Leff, "Unconscionability

---

7. Under the facts here, the lease agreement was clearly a "security interest" as opposed to a "true lease." U.C.C. Sec. 1–201(37); Hawkland, "The Impact of the Uniform Commercial Code on Equipment Leasing," *supra.*

8. Sec. 2–316(2) provides: "to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous * * * ."

9. Sec. 2–302(1) provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

and The Code—The Emperor's New Clause," 115 U.Pa.L.Rev. 485 (1967) which has been widely accepted by legal commentators [10] and by New York case law. *Industralease Automated & Scientific Eq. Corp. v. R. M. E. Enterprises, Inc., supra,* 396 N.Y.S.2d at 431.

■ Under the *Leff* test, a distinction is made between "substantive" and "procedural" unconscionability. By substantive unconscionability is meant an undue harshness in the contract terms themselves. On the other hand, procedural unconscionability in general is involved with the contract formation process, and focuses on high pressure exerted on the parties, fine print of the contract, misrepresentation, or unequal bargaining position. Generally there must be both procedural and also substantive unconscionability before a contract or a clause can be voided under Sec. 2–302. S. Deutch, *supra note 10;* White and Summers, *supra note 10;* Spanogle, *supra note 10.* In the application of these concepts, it has been suggested by one leading writer that there be a balancing between the substantive and procedural aspects, and that if there exists gross procedural unconscionability then not much be needed by way of substantive unconscionability, and that the same "sliding scale" be applied if there be great substantive unconscionability but little procedural unconscionability. Spanogle, *supra note 10.*

### A. *Substantive Unconscionability.*

■ Applying these general concepts to the facts of the present case, little appears by way of substantive unconscionability.[11] King Louie argues that there is unconscionability in this sense, because the disclaimer deprives it of its most effective remedy despite the fact that the leased equipment has proved to be useless. King Louie derives this argument from *United States Leasing Corp. v. Franklin Plaza Apts., Inc.,* 65 Misc.2d 1082, 319 N.Y.S.2d 531 (1971).[12] That opinion was by a civil court of the City of New York, a court of inferior and limited jurisdiction, and the approach toward the problem of unconscionability adopted in that opinion has not been approved or followed by any court of superior jurisdiction in New York. Moreover, the approach taken to this problem by *United States Leasing* is inconsistent with subsequent opinions by courts higher in the New York judicial heirarchy, those being the decisions of the Supreme Court, Appellate Term, First Department, in *Leasco Data Processing Equipment Corp. v. Starline Overseas Corp., supra,* and by the Supreme Court, Appellate Division, Second Department, in *Industralease Automated & Scientific Eq. Corp. v. R. M. E. Enterprises, Inc., supra. United States Leasing* therefore cannot be considered as declarative of New York law.

King Louie's argument would have great appeal if the lease agreement here had undertaken to deprive it of all warranty rights against either the financing party, Funding Systems, or the supplier, IGM. Very little would have to be added to such a total destruction of right to relief to require that it be declared unconscionable. That indeed was the situation in *Industralease, supra,* and is another important basis upon which that case must be distinguished from the present situation. Here, in contrast, King Louie retains its full rights for breach of warranty against IGM. As to the impor-

---

10. *E. g.,* Spanogle, "Analyzing Unconscionability Problems," 117 U.Pa.L.Rev. 931 (1969); White and Summers, "Uniform Commercial Code," (Hornbook Series, 1972); S. Deutch, "Unfair Contracts," (1977); Note, 27 Buffalo L.Rev. 521 (1978).

11. A disclaimer of implied warranty could hardly be unconscionable in and of itself, without more, in view of Sec. 2–316 which specifically authorizes such disclaimer if done in an appropriate way, at least when the surrounding circumstances do not make that improper.

12. *United States Leasing* does not involve warranty disclaimer, but rather the requirement of a special notice provision under Article 10 of the New York Personal Property Law which has never been drawn into contention in our case. Therefore, *United States Leasing* constitutes no authority respecting applicability of U.C.C. art. 2 to Funding Systems, the issue for which King Louie cites that case. Nevertheless, the opinion in *United States Leasing* does contain relevant comments on the issue of unconscionability.

tance of this factor, see especially *Citicorp Leasing, Inc. v. Allied Institutional Distributors, Inc., supra; Atlas Industries, Inc. v. National Cash Register Co., supra; All-States Leasing Co. v. Bass, supra.*

### B. Procedural Unconscionability.

■ While it is difficult at best to find any sound basis for declaring any substantive unconscionability in this case, it becomes flatly impossible to do so with respect to the aspect of procedural unconscionability. There can be no claim of surprise on the part of King Louie in light of the very prominent and conspicuous nature of the written disclaimer on the face of the lease agreement. Furthermore, as admitted by counsel for King Louie in the course of oral argument before this court, there is no claim by it of any economic coercion. Nor is there any showing whatsoever of any high pressure tactics exercised against King Louie. Still further and of very great importance, there is and could be no claim as to any inequality of position.

*Leasco Data Processing Equipment Corp., supra,* is squarely in point. That case under parallel facts refused to find a disclaimer of liability by the financing party under an equipment lease to be unconscionable. In reaching that conclusion the court emphasized that the litigation was between two business corporations dealing at arms length through representatives who were "presumably well advised, alert, knowledgeable business men." Exactly the same is true in the present case. King Louie was a multi-million dollar corporation, whose stock was publicly held, who had been acquiring property by lease-purchase agreements for more than fifteen years, and who was actively represented in this very transaction by an experienced, sophisticated attorney.

*Industralease,* upon which King Louie places heavy reliance, is plainly distinguishable, not only for the reasons already stat-ed, but also on further considerations. The peculiar facts of the *Industralease* case, some of which have already been referred to in this opinion, are summarized at page 432 of the *Industralease* opinion to show the unconscionability there involved:

"Here the evidence is that shortly before the incinerators were to be delivered, the defendants were told that the contract in existence between themselves and Clean Air could not be performed for not clearly communicated reasons, and that a new contract had to be executed to insure delivery of the equipment. The new contract eliminated the warranties which the Clean Air contract had preserved, since Clean Air was the manufacturer of the equipment. The atmosphere of haste and pressure on the defendants is clearly pervasive. In addition, at this point of the bargaining, with the beginning of the season for the defendants' operations at hand, the defendants were clearly at a disadvantage to bargain further and, indeed, did not profess to understand the size and mechanism of the equipment which would satisfy their needs."

The facts of that case, so summarized, bear no resemblance to the facts here.

### C. Sliding Scale Evaluation.

■ Even if it could be said that the present case presents some element of substantive unconscionability (although we are of the contrary opinion), King Louie has completely failed to show any procedural unconscionability. Applying a sliding scale balancing of all factors, there has been an insufficient proof of such unfairness as would justify declaring invalid an express provision of the written contract between these parties. In this connection, it must be remarked that equipment leasing carries great advantages for the buyer-lessee which have caused it to burgeon to great popularity.[13] This fresh popularity results from tax laws and accounting procedures which allow

---

13. *Fortune*, November, 1976, p. 50 reports that equipment leases accounted for a full 15% of all capital outlays for 1975. The dollar volume, between $50 to $80 billion for that industry, was forecast to increase to $150 billion by the end of 1980. Comparable reports are found in *Forbes*, January 15, 1975, p. 42, and *Iron Age*, July 12, 1976, p. 27.

a business man to acquire new goods through a lease and also enjoy the advantage of an accelerated depreciation.[14] A further advantage to the lessee is conservation of capital outlay and preservation of credit capacity.[15] King Louie cannot seek these advantages and at the same time claim that concomitant contract protection to the financing party is unconscionable. The disclaimer of warranty by the financing party is universal in the commercial world and is reasonable. A valuable business device should not be unnecessarily impaired and perhaps destroyed by an unsympathetic lack of understanding by the courts of the underlying economic considerations. For these reasons, claims of unconscionability in this type of transaction have been denied not only in the New York *Leasco* decision, but also in the following cases in other states: *Bill Stremmel Motors, Inc. v. IDS Leasing Corp., supra; Walter E. Heller & Co., Inc. v. Convalescent Home,* 49 Ill.App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977).

There remains for brief mention the fact that the trial court held a preliminary hearing on the question of unconscionability, at the conclusion of which it found that the lease agreement "is unconscionable in that it would deny that the Defendants can show the circumstances existing at the time, would destroy warranties of merchantability and fitness to perform as represented and would deny and destroy the understanding and agreement among the parties that the equipment would belong to Defendant, King Louie, at the end of the period upon the payment of One Dollar ($1.00). The court finds that Defendants shall not be deprived, because of the terms of the contract, the right to produce evidence of circumstances at the time of the contract, including representations made, and evidence concerning design, manufacture and performance." That preliminary finding and order shows by its own terms that it was not intended to be a final adjudication upon the question of unconscionability. Moreover, any such preliminary order is in its nature merely interlocutory and remains subject to later modification or reversal. *Rozansky Feed Co., Inc. v. Monsanto Company,* 579 S.W.2d 810, 1979, and cases therein cited. A fair reading of the trial court's findings and conclusions yields the conclusion that the trial court did reach as his final decision that the lease agreement was not unconscionable. In any event, a finding here of unconscionability would be contrary to the weight of the evidence and would therefore be reversible under the standard of *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

## III.

## DAMAGES

King Louie argues principally with respect to damages that it is unfair to enter judgment against it in favor of Funding Systems in the amount of $63,485.50, but to limit King Louie's recovery against IGM to only $22,862.86. That complaint has merit.

The amount of the judgment entered by the trial court on King Louie's third-party petition against IGM consisted of the following items: $3,214.44, which was the down payment made by King Louie to IGM; $18,743.77 which were the total monthly payments made by either King Louie or Intermedia to Chase Manhattan; and $904.65 which was an item of personal property tax on the equipment advanced by Funding Systems when default was made in that respect under the lease agreement.

---

14. Wyatt, Accounting for Leases, II, 1972 U.Ill. L.Forum 297; Coogan, Leases of Equipment and Some Other Unconventional Security Devices, 1973 Duke L.J. 909, n. 5.

15. A *witness* for Intermedia testified that it would give its required consent to King Louie's acquisition of this equipment only if King Louie did so by means of a lease-purchase agreement.

He stated Intermedia's reason as follows: "[We] didn't want to pay another $50,000 in cash for this equipment outright and therefore, the lease-purchase as presented to us made more sense because King Louie would pay their proportionate share as long as they used it, which would be three or four months and he [sic] would have the remainder for us to use."

No good reason can be perceived why those items should be distinguished from and be given different treatment from the $63,-485.50 which King Louie will be required to pay to Funding Systems by reason of the judgment, all of which is directly tied to the acquisition of this equipment. Both the amounts paid before suit and the additional amount which will have to be paid under the judgment resulting from the suit are equally part of "the price as has been paid" which the buyer is entitled to recover upon rejection of the goods or revocation of acceptance, under the provisions of U.C.C. Sec. 2-711. See *Carl Beasley Ford, Inc. v. Burroughs Corporation*, 361 F.Supp. 325, 1. c. 334 (D.C.Pa.1973). Even were that not so, King Louie should be entitled to that additional sum as consequential damages. A buyer upon rejection or revocation of acceptance is entitled to consequential damages under U.C.C. Sec. 2-715(2). *Lloyd v. Classic Motor Coaches, Inc.*, 388 F.Supp. 785[4] (D.C.Ohio 1974); *Davis v. Colonial Mobile Homes*, 28 N.C.App. 13, 220 S.E.2d 802[4] (1975); *La Villa Fair v. Lewis Carpet Mills, Inc.*, 219 Kan. 395, 548 P.2d 825[11] (1976).

King Louie further argues that it should be allowed recovery of its attorneys' fees, and it made an offer of proof that its attorneys in this litigation devoted a total of 222.75 hours at a reasonable charge of $50 per hour. Assuming that King Louie's attorneys' fees in defending against Funding Systems was a loss "which the seller at the time of contracting had reason to know and which could not reasonably be prevented" and so within Sec. 2-715(2), nevertheless, there is still another hurdle which King Louie has not surmounted in the way of its recovery of attorneys' fees. Even on the assumption made that the cost of defending against Funding Systems is a proper element of damage, still King Louie is not entitled to recover that part of its attorneys' fees representing its cost of enforcing warranties against IGM. *Universal C.I.T. Cr. Corp. v. State Farm Mut. A. Ins. Co.*, 493 S.W.2d 385, 393[10] (Mo.App.1973). King Louie has not disentangled what its attorneys did in those two different re-spects and has made no proof of any allocation as between those two branches of legal services. In the absence of such an allocation, there is no proper basis upon which to make any allowance of attorneys' fees.

The judgment is modified to the extent of increasing King Louie's judgment against IGM from $22,862.86 to $86,348.36. As so modified, the judgment is affirmed. Costs are assessed one-half to IGM and one-half to King Louie. The request by King Louie to tax costs against Funding Systems, on the ground that the latter unnecessarily increased the cost of the transcript, is denied because the ground alleged has not been proved.

SWOFFORD, C. J., and DIXON, PRITCHARD, SOMERVILLE and CLARK, JJ., concur.

SHANGLER, J., dissents in separate opinion filed.

SHANGLER, Judge, dissenting.

The majority opinion is valid as a didactic statement of legal principle but not as a decision of the dispute presented by the parties. It assumes a state of facts which does not describe the commercial reality of the transaction, and hence reaches a mistaken end.

The transaction was a lease-purchase of an electronic system to automate a radio station owned by King Louie International. The equipment was purchased from International Good Music, manufacturer, after survey of other products on the market and on assurances of suitability for the intended use. King Louie and IGM concluded a five-year lease of the equipment with the option at the end of the term for purchase of the system by King Louie on the payment of One Dollar. Within weeks, IGM solicited International Financing, Inc., a lease-broker, to finance the transaction. International Financing, Inc. found Funding Systems Leasing Corporation for that purpose. Funding Systems was a financer of leases of equipment in general and not a buyer and seller of goods, as such. Funding Sys-

tems approved the King Louie credit and by separate instrument concluded a five-year lease agreement [later modified to allow the One Dollar purchase option at the end of the lease term] of the electronic broadcast system. The equipment was installed but never functioned as a system nor performed dependably. The product was so faulty that the installation was finally abandoned and the radio station reverted to manual operation. Intermedia [successor to King Louie as owner of the radio station] refused to make further payment to Chase Manhattan Bank [assignee of Funding Systems]. Funding Systems sued King Louie to recover the balance of the lease-purchase obligation. King Louie sought recission and restitution for misrepresentation and breach of warranty against Funding Systems as a transactor in goods—on the assertion the disclaimer of warranty in the lease-purchase instrument was unconscionable within § 400.2–302 of the Uniform Commercial Code and so not entitled to effect. King Louie also proceeded against IGM for breach of warranty. The trial court denied remedy against Funding Systems and granted only partial remedy against IGM—by then in liquidation.

The majority judgment rests on premises *of fact and law* that the lease was merely a device to finance the debt for the equipment purchase and so not a *transaction in goods* within the scope of Article 2 on Sales of the Uniform Commercial Code [§§ 400.2–101 et seq.; § 400.2–104]. I conclude, rather, that although in the form of a financing transaction, the lease was actually a sale of goods by Systems Leasing, so that the unconscionability and warranty provisions of the statute apply and must be given effect.

The past decade has seen a new economic use burgeon for an old commercial device: the equipment lease.[1] The fresh popularity results from tax laws and accounting procedures which allow a businessman to acquire new goods through a lease and also enjoy the advantage of an accelerated depreciation.[2] The usual terms of such a lease commit the lessee to a noncancellable obligation for the use of the property for its entire economic life. The lessee pays the full market price with an option to purchase and the lessor recoups the investment with interest. The advantage to the lessee is the conservation of capital outlay and preservation of credit capacity and the advantage to the lessor is a profit without the warranty impediments which encumber a seller.

The lease thus had become a useful method to finance equipment. A third-party lease system has evolved for that very purpose. Under this arrangement the lessor purchases the equipment from a supplier for the specific purpose to fill the need of the lessee. The article is shipped directly to the lessee without manipulation by the lessor. The lease—whereby the lessor recaptures the cost with interest and the property vests in the lessee at the end of the term—becomes indistinguishable from a sale. A true finance lease is a transaction in money and not in goods by a financier and not a seller. The finance lessor, by the usual terms of the transaction, assumes no responsibility for the selection, suitability, or performance of the equipment. Thus, the true lease financer does not sell nor undertake to transact in goods—but only to finance their use.[3]

The majority opinion sees the lease-purchase transaction as a classic three-party financing arrangement, contemplated as such between King Louie and IGM "from the very beginning," and confirmed "[v]ery tellingly [by] the timing of the various steps" into final integration of the equip-

---

1. *Fortune*, November, 1976, p. 50 reports that equipment leases accounted for a full 15% of all capital outlays for 1975. The dollar volume, between $50 to $80 billion for that industry, was forecast to increase to $150 billion by the end of 1980. Comparable reports are found in *Forbes*, January 15, 1975, p. 42, and *Iron Age*, July 12, 1976, p. 27.

2. Wyatt, *Accounting for Leases*, II, 1972 U.Ill. L.F. 497; Coogan, *Leases of Equipment and Some Other Unconventional Security Devises*, 1973 Duke L.J. 909, 912, n. 5.

3. Hawkland, *The Impact of the Uniform Commercial Code on Equipment Leasing*, 1972 U.Ill. L.F. 446, 449.

ment agreement between King Louie and Funding Systems. That premise, once adopted, leads inexorably to the majority result—for in such case, the transaction would be in money, not goods [§ 400.2–104(1) & (2)], no warranty would attend [§ 400.2–314], King Louie would be without status to claim unconscionability [§ 400.2–302(2)] or other remedy open to a buyer of goods. It is a premise, however, the evidence, under scrutiny, does not allow.

The evidential ground for decision rests on the ultimate conclusion—in the terms of the opinion—that

"[t]he parties here from the outset contemplated the very . . . kind of third party lease-financing which has become a familiar and much used device in American business . . . King Louie knew from the beginning that the financing would be by a third party."

This premise, in turn, derives from other inferences of fact and interpolations the opinion postulates:

*The lack of facility by IGM to finance the transaction.*

"IGM did not have any facilities for carrying the financing of the lease agreement itself. Its general practice with respect to such lease-purchase arrangements was to utilize the services of a finance broker."

*The transaction among King Louie, IGM and Funding Systems was concurrent.*

"At the very same time that IGM sent its Equipment Proposal to King Louie, it concurrently wrote to International Financing to get the third-party financing under way. International Financing then very promptly got in touch with King Louie to request the necessary forms signed which would have to be submitted to the financing company, and International Financing did very promptly proceed to submit the proposed transaction for approval to Funding Systems. Funding Systems without any delay then in its turn submitted its documents to King Louie, and negotiations immediately ensued between Funding Systems and [King Louie attorney Rich] with respect

to the financing terms. Those discussions were memorialized by written correspondence between Funding Systems and Rich as early as April 24, 1970. The lease agreement itself soon followed on May 7, 1970 . . . ."

*The negotiations between King Louie attorney Rich and Funding Systems.*

"Rich in his deposition which was introduced into evidence [testified]:

'We originally started out thinking that IGM was going to carry the paper itself, as I recall, there was some conversation, with a sibling company or subsidiary company that purported to be in the leasing or financing business. *We didn't care how IGM chose to finance their arrangements so long as it didn't make any difference in our arrangements with them.*' [Emphasis added]."

On the full evidence, these inferences are frangible, and do not prove a three-party transaction. The full evidence proves, rather, a straightforward, consummated two-party equipment lease-purchase between King Louie and IGM which Funding Systems then adopted and assumed from IGM.

The ground of the majority opinion that the parties contemplated, and King Louie knew from the first, that the purchase would be financed by a third party, is not compatible with the history of the transaction: On March 30, 1970, and April 1, 1970, King Louie agreed to two orders for the lease-purchase of electronic equipment from IGM, the manufacturer. The term was for five years at a specified monthly sum with the option at the end of the term for purchase of the system by King Louie on the payment of One Dollar. The order form called for a cash balance to be paid the manufacturer within thirty days after shipment and three advance monthly payments, which King Louie duly remitted to IGM within the week. Each equipment order form provided for payment to IGM, that title to and right to possession of the goods remained in IGM until full purchase was paid, and that the goods carried full warranty for one year. Within days, some of the equipment was delivered by IGM, but to

a mistaken site. The sale was preceded by an IGM request for fiscal references, which King Louie supplied. There was no suggestion in the letters of any other purpose than to satisfy IGM that King Louie was fiscally responsible for the obligation between them. Nor was there any suggestion in the order forms for the equipment of a contemplated assignment of the obligation to IGM or other variance of the payee. These are significant indicia of a two-party contract to which the majority opinion gives no account.

It was in this posture of *a sale, concluded as to every essential term,* as well as delivery in part, that IGM—without the knowledge or concurrence of King Louie [unless we must infer, as does the majority, foreknowledge of such a design from the bare request for credit information] that IGM solicited International Financing, Inc., the lease broker for Funding Systems. It is so, that thereafter King Louie executed forms which culminated in the lease-purchase agreement with Funding Systems, but as becomes evident, although that transaction was sequential to the IGM—King Louie equipment purchase, it was not integral to that completed commercial event. The forms presented by Funding Systems were subscribed by King Louie, as it appears, as nothing more than a convenience for IGM since the terms for deferred payment for the equipment had already been concluded between IGM, the manufacturer, and King Louie, the purchaser. The Funding Systems transaction was independent of the original purchase contract, without benefit to King Louie and with benefit for IGM and Funding Systems only. It represented a purchase by Funding Systems of the obligation owed IGM by King Louie and a concomitant assumption of obligation owed King Louie by IGM. In legal effect, Funding Systems was to IGM an assignee and to King Louie a surrogate seller—with all attendant obligations of warranty, good faith and conscionability such a transaction imports. [Sections 400.1–201(19); 400.2–302; 400.2–314; *Fairfield Lease Corp. v. Umberto,* 7 U.C.C.Rep.Serv. 1181 (1970)].[4]

The subpremise of the majority opinion that the IGM lack of facility to finance the sale of its costly equipment and its general use of a broker to finance lease sales tend to prove that "King Louie knew from the outset that the financing would be by a third party" does not follow logically. The preliminary exchanges between IGM and King Louie give no intimation of a third party to the contract. The letters in exchange between them, the IGM equipment proposal forms by which the goods were ordered, the acceptance of the proposals—*none of them* suggests any terms of sale additional to those adopted between them nor any party in interest other than themselves. Funding Systems, to reiterate, came to a sale already agreed and completed to which it was not privy. On elementary principles of contract law, King Louie cannot be bound to knowledge of terms of contract without assent. *Pink v. American Surety Co. of New York,* 283 N.Y. 290, 28 N.E.2d 842, 845[7] (1940); Williston on Contracts, § 648 (3d ed.).

Nor does another subpremise of the majority opinion—that "King Louie was fully familiar with the usual methods of lease-purchasing [and] had made all of its major acquisitions [except real estate] by lease-purchase arrangement for at least the past 15 years" add any more logic to the conclusion that King Louie on that account, and on account of the general practice to finance lease purchases by IGM, expected a third-party transaction. This evidence, derived from King Louie attorney Rich, establishes merely that King Louie used the lease-purchase device for its costly plant acquisitions—no doubt, as a mode of accelerated depreciation and tax advantage. That evidence does not say, or even suggest, that these habitual purchases were other than by a two-party transaction, to which the lease-purchase device lends itself as readily as to a third-party transaction—as, for instance, where the manufacturer has the capacity for deferred payment transactions or the lessee-purchaser has sufficient

---

4. The lease, by its terms, adopts New York law to define the rights and liabilities of the parties.

capital resources for outlay. The distinction is critical: the two-party lease-purchase is a *transaction in goods* analogous to a sale, and so within the protections of Article 2 of the Code [*Owens v. Patent Scaffolding Co.*, 77 Misc.2d 992, 354 N.Y. S.2d 778, 780[3, 4] (1974)] while a true third-party arrangement merely finances the purchase debt and so is a transaction in money unattended by obligation of warranty or conscionability of contract. [*Leasco Data Processing Equipment Corp. v. Starline Overseas Corp.*, 74 Misc.2d 898, 346 N.Y. S.2d 288 (1973); Note, *Warranties in the Leasing of Goods*, Ohio State L.J., Vol. 31, p. 140, l. c. 144 et seq. (1970)]. The insistence by attorney Rich that there be no surrender of warranty to Funding Systems [related in fuller context shortly] implies a practice by King Louie to two-party lease-purchases whereby the merchantability and fitness for use of the costly equipment were ensured by warranty. In further proof that debt finance was not, in fact, the object for subscription to the Funding Systems proposals, the forms were modified to conform with the purchase option provision for One Dollar at the end of the lease term and—so attorney Rich assumed—to preserve the warranty.

The remainder subpremise of the majority opinion attempts to prove, by a fragment of the testimony of King Louie attorney Rich, that he understood by the negotiations with Funding Systems that the lease purchase was a three-party transaction. The evidence takes on a completely different aspect, however, in the full context of testimony. The subject of the inquiry was the terms of the lease-purchase documents used to order the equipment from IGM.

ON DIRECT EXAMINATION:

Q. Was this an arrangement and the understanding as you counseled with your client at the time the equipment was purchased?

A. Absolutely. Not only my client but with the plaintiffs [Funding Systems] in this lawsuit . . .

Q. All right. Now, at some subsequent time did you have any contact with one who subsequently purchased this equipment for sale to King Louie International, Inc.?

A. Yes, sir.

Q. And with whom did you have subsequent contact, Mr. Rich?

A. I cannot presently recall his name. It was a fellow at Funding Systems.

\* \* \* \* \* \*

Q. All right. Now, you mentioned a moment ago that *in your counseling and in the purchase of this equipment it was on a lease purchase arrangement, is that correct*?

A. *Yes, sir.*

Q. *Is there some significance to that* so far as warranties concerning the material is concerned?

A. *Well, we had warranties, sure, warranties of fitness under the code and the contract, referring now to the proposals which were accepted and which IGM always acknowledged as a completed deal, contained warranties by their terms as well as the warranties that are contained in commercial transactions under the U.C.C.*

Q. Was it your opinion, as the counsel for King Louie International, Inc., that *the matter as arrived at and consummated with International Good Music* contained the usual warranties of merchantability and fitness for the purpose it was manufactured?

A. Absolutely.

Q. *Now, I would ask you this: In your conversations that you had with Mr. Larson of Funding Systems, was there ever any discussion that the transaction with them would be any different so far as these warranties were concerned?*

A. *Absolutely not.*

Q. Was there any conversation with him concerning the understanding that the purchase arrangement with Funding Systems was to be the same

as it was with International Good Music?

A. There was, yeah.

Q. And what was that conversation?

A. *The understanding was that Funding Systems were going to understand— were adopting the deal with IGM from our point of view.* We originally started out thinking that IGM was going to carry this paper itself, as I recall, there was some conversation, with a sibling company or subsidiary company that purported to be in the leasing or financing business. *We didn't care how IGM chose to finance their arrangements so long as it didn't make any difference in our arrangements with them.*

Q. *Was there ever any understanding or conversation with anyone in Funding Systems Leasing Corporation that this equipment as enumerated and identified on Exhibits 1 and 2 was to be simply leased and all warranties surrendered?*

A. *Of course not. Correspondence shows that.*

\* \* \* \* \* \*

Q. Did you ever review or forward to Mr. Lerner [Executive officer of King Louie] for execution any document by which this equipment was leased rather than lease purchased and by which all warranties were surrendered?

A. No, sir.

\* \* \* \* \* \*

Q. All right, sir. To your knowledge was there ever any understanding that any agreement would be reached by which this equipment would be leased or purchased surrendering and forfeiting all warranties of fitness merchantability?

A. Certainly, no, sir.

\* \* \* \* \* \*

Q. *Did Funding Systems, in any of your communications with them, ever indicate that the arrangement by which* this equipment was sold or lease purchased to King Louie was under any different arrangement than that which had been made with International[?]

\* \* \* \* \* \*

A. Not prior to the time that we advised Funding Systems that the company, King Louie, was not going to pay for the equipment. Prior to that time *they assured us that the deal was exactly the same, that they were just stepping into the shoes of IGM.*

Q. All right.

A. Thereafter—

Q. You learned that there was a different contention made?

A. Absolutely.

\* \* \* \* \* \*

Q. All right. I'll ask you, *was there ever any intent or any understanding or agreement that this equipment would be leased or lease purchased by an arrangement which would forfeit all warranties of fitness, warranties of merchantability, and forfeiting of equipment at the end of the term and forfeiting all payments?*

A. *Absolutely not. There was never* with anybody at any time prior to the institution of this lawsuit any conversation, correspondence, or otherwise, which I am aware of, that had—made reference to any leasing that wasn't a lease purchase plan, because they don't do business that way, never have and certainly there was never any remission without consideration of our warranties. [Emphasis supplied.]

\* \* \* \* \* \*

The insistent testimony of attorney Rich, stated and restated, that the transaction intended was between manufacturer IGM and purchaser King Louie with the full warranty contemplated for a sales transaction under the Code was merely reaffirmment.

ON CROSS–EXAMINATION:

Q. When was the first time that you became aware that King Louie International, Inc., had leased equipment from Funding Systems Leasing Corporation?

* * * * * *

A. *My understanding was that that lease arrangement was a lease arrangement we had made with IGM, which was a walk away lease, or abandon lease, for one dollar, at the termination of a period of time, a certain number of payments with full warranties as set out in the—*

* * * * * *

Q. Is it your testimony that James Larson indicated to you that Funding Systems Leasing Corporation was extending warranties to King Louie International, Inc., with reference to this equipment?

A. *It is my understanding, from Larson, that they were standing in the shoes of IGM. Whatever the arrangements we made with IGM they were just purchasing the equipment from IGM and making the same arrangement with us; yes, that is my understanding.*

Q. And that arrangement was what?

A. *And that arrangement was a lease purchase of this automated equipment, whatever it was, to be financed through the lease device and purchased at the end of a particular term and that the equipment, of course, would have the normal warranties and fitness for service.*

* * * * * *

Q. Other than that document do you know of any other written agreement under which King Louie International, Inc., would have paid Funding Systems Leasing Corporation moneys totalling approximately twenty thousand dollars?

A. Well, I think there was—there may have been some agreement, some assignment between IGM and Funding Systems that I know nothing about and had direction to pay Funding Systems, but I know of no other document.

Q. Do you know of any assignment from IGM to Funding Systems Leasing?

A. No, sir.

Q. Do you know of any connection between IGM and Funding Systems Leasing?

A. Well, I know that there had to be some kind of commercial relationship as far as this transaction was concerned, but other than that I have no knowledge.

Q. And upon what do you base that assumption?

A. We made a deal with IGM, okay, the next thing *I know I'm hearing from Funding Systems, so I would assume that there was some privity there,* although perhaps I should not make that assumption.

[Emphasis supplied.]

This extended evidence, unnoticed by the majority opinion, means quite plainly that King Louie understood the transaction as a direct two-party lease-purchase of the equipment attended with warranties of sale. This evidence means also that by signature to the Funding Systems forms King Louie meant only to accept another seller "in the shoes of IGM" and, whatever else, to preserve the express warranties given by the documents of sale with IGM, as well as the warranties implied by law under the Code. This evidence implies clearly, also, that the usual lease-purchase practice used by King Louie was of the two-party kind and that King Louie fully excepted the transaction with IGM was of that kindred, protected by warranty and unaffected by the substitution of Funding Systems as seller by assignment.

In the full context of testimony, the solitary fragment of Rich testimony cited by the majority opinion

[w]e didn't care how IGM chose to finance their arrangements so long as it didn't make any difference in our arrangements with them.

does not allow the inference the majority draws—that King Louie understood from the first the transaction would entail a third-party financer—but rather, that King Louie was indifferent to whatever the overture by IGM to Funding Systems brought to the sales transaction between King Louie and IGM except that the sales warranties be unaffected.

Finally, the testimony of attorney Rich asserts what the other evidence fairly shows—and the trial court expressly found[5] —that the sale between King Louie and IGM was concluded before IGM [for whatever reason] solicited the intercession of Funding Systems into the transaction.

The evidence entirely, the post-sale letter exchanges among King Louie, Funding Systems and assignee Chase Manhattan Bank included, shows a lease-purchase fully concluded between King Louie and IGM as the true transaction into which IGM solicited Funding Systems to intervene by purchase of the deferred payment obligation owed IGM by King Louie. Accordingly, IGM was a lessor-seller of goods and, on basic principles of the law of assignments, Funding Systems succeeded to the obligations for warranty, fair dealing and conscionability

of contract that accrued to King Louie under the original terms of sale—unless, of course, relinquished thereafter by King Louie. Restatement of Contracts, § 167 (1934); Corbin on Contracts, § 892 (1951); Fritch & Reisman, Equipment Leasing— Leveraged Leasing, p. 617.

Funding Systems, thus, was successor to the status as lessor-seller of goods to King Louie, and as such, by established New York law, was governed by Article 2 on Sales which—by definition—applies to *transactions in goods*. The policy which treats a lease of equipment as concluded by King Louie as a simulated sale—and thus a *transaction in goods* —rests on the rationale that [*Hertz Commercial Leasing Corp. v. Transportation Credit Clearing House*, 59 Misc.2d 226, 298 N.Y.S.2d 392 (1969), rev'd on other grounds, 64 Misc.2d 910, 316 N.Y. S.2d 585 (1970), l. c. 298 N.Y.S.2d at 395] [in] view of the great volume of commercial transactions which are entered into by the device of a lease, rather than a sale, it would be anomalous if this large body of commercial transactions were subject to different rules of law than other commercial transactions which tend to the identical economic result.[6]

**5.** The Findings of Fact, one through nine, also unnoticed by the majority opinion recite:

1. In March and April of 1970, and for several years prior thereto, the Third Party Defendant, International Good Music, Inc. (hereinafter referred to as IGM) engaged in the business of manufacturing radio automation systems.

2. In March and April of 1970, and for a period of time prior thereto, King Louie International, Inc. (hereinafter referred to as King Louie) owned Radio Station KBEA and was desirous of purchasing a radio automation system.

3. In April of 1970, King Louie entered into an agreement with IGM to lease-purchase an IGM 630 system. This agreement was embodied in written proposals numbered 7408 and 7420 signed by representatives of the parties.

4. IGM represented that the 630 automation *equipment would automate the operation of* Station KBEA including accurate timing of programmed events such as commercials, features, music, news and hourly and semi-hourly joining of affiliate network stations.

5. Warranties of merchantability and fitness for the particular purpose for which manufac-

tured as provided in the Uniform Commercial Code were not excluded in the proposals.

6. Relying on the representations and the skill and judgment of IGM, King Louie forwarded its check in the amount of $3,214.44 to IGM as the first and last two payments as required by proposals 7408 and 7420.

7. IGM accepted the check as payment of the first and last two payments as evidenced by a letter dated May 10, 1970, signed by Rogan Jones, President of IGM.

8. Sometime in March or April, 1970, IGM contacted a 'lease-brokerage' firm named International Financing Incorporated which in turn contacted the plaintiff, Funding Systems Leasing Corporation regarding sale to Funding Systems of the same automation equipment herein involved.

9. Funding Systems thereafter, on or about April 1st, 1970, bought the automation equipment as set out in Lease No. 0403083, with the warranties and guaranties extended to any buyer under the Uniform Commercial Code.

**6.** The majority unfairly disparages the authority of *Hertz* as precedent to treat a sale guised as a lease of equipment as a sale nonetheless— and therefore a *transaction in goods* within the

It is the augury of this principle that an entrepreneur who seeks the advantage of a seller—whatever form the transaction—must bear the obligations of a seller. It is the contention of King Louie that since the transaction with Funding Systems was actually a sale, that plaintiff warranted the merchantability and fitness for use of the equipment and is answerable for their breach. The circumstances of *this transaction* dispel the contention by Funding Systems that it was merely a finance lessor and so not amenable to Article 2 on Sales, but Funding Systems contends, notwithstanding, if warranties attended the transaction they were disclaimed by the conspicuous writing of exclusion required by § 400.2–316 contained in the agreement. King Louie responds, all else notwithstanding, that the lease agreement was unconscionable within the terms of § 400.2–302.

It remains only to decide whether the terms of surrender of warranty and defenses of the form contract between King Louie and Funding Systems was by conscionable assent.

The form contract submitted by Systems Leasing and subscribed by King Louie was unconscionable and should not be enforced.

Unconscionability does not displace freedom of contract in commercial transactions. Rather, freedom of contract is made a principle of the Code by § 400.1–102(3) that "[t]he effect of provisions of this [Act] may be varied by agreement." [U.C.C. Comment 2]. That principle, however, is subject to the specific exceptions of that section that the parties may not disclaim the obligations of good faith and reasonableness prescribed by the Code. Although not dubbed in those terms, the authorities agree that another obligation under the Code which may not be varied or avoided by agreement is the provision of § 400.2–302 for conscionability of contract. White and Summers, *Uniform Commercial Code*, § 3–9 (1972); Deutch, *Unfair Contracts: The Doctrine of Unconscionability* (Lexington Books, 1976). Thus, the Code imposes these obligations in every contract for the sale of goods.

The doctrine of unconscionability derives from both the common law and the equity practice. The courts were reluctant to invalidate on the express ground that a particular clause or contract was unfair. Out of a regard for "freedom of contract" they used formal devices of construction and other covert methods to accomplish that pur-

operation of Article 2 of the Code. The comment at note 4 of the majority opinion not only misconstrues the appellate disposition of *Hertz* but overlooks the pervasive authority of the lower Civil Court rationale in subsequent decisions—not only by the New York courts, but in other jurisdictions. The perception of the majority that *Hertz* can be of no value as a precedent because the appellate decision which reversed *Hertz* determined that "the Civil Court should not have reached the questions of law regarding the application of U.C.C. Article 2, thereby in effect vacating that part of the Civil Court opinion relied on by King Louie" is simply mistaken. *Hertz* was reversed on a ground of procedure, but the appellate decision left the substantive declarations of the Civil Court intact. That continued validity in New York is shown by at least six court decisions, the appellate term among them, which have since cited the original *Hertz* opinion with approval. See, for instance, *Owens v. Patent Scaffolding Co.*, 77 Misc.2d 992, 354 N.Y.S.2d 778, 781 (1974); *Fairfield Lease Corp. v. George Umbrella Co., Inc.*, 8 U.C.C. 184 (N.Y.Civ.Ct.1970); *Granite Equipment Leasing Corp. v. Everett School, Inc.*, 9 U.C.C. 849 (N.Y.Civ.Ct.1971);

*Industralease Automated & Scientific Eq. Corp. v. R.M.E. Enterprises, Inc.*, 58 A.D.2d 482, 396 N.Y.S.2d 427, 430 (1977) [cited prominently for other purposes by the majority opinion]. The influence of the original *Hertz* decision continues beyond the immediate forum: *Mays v. Citizens & Southern National Bank*, 132 Ga.App. 602, 208 S.E.2d 614 (1974); *May Co. v. Trusnik*, 54 Ohio App.2d 71, 375 N.E.2d 72 (1977); *Walter E. Heller v. Convalescent Home*, 49 Ill. App.3d 213, 8 Ill.Dec. 823, 365 N.E.2d 1285 (1977); *Atlas Industries, Inc. v. National Cash Register Co.*, 216 Kan. 213, 531 P.2d 41 (1975) [cited for other purposes by the majority opinion]; *A–Leet Leasing Corp. v. Kingshead Corp.*, 150 N.J.Super. 384, 375 A.2d 1208 (1977); *C & J Fert., Inc. v. Allied Mut. Ins. Co.*, 227 N.W.2d 169 (Iowa 1975), and others. These cases cite the precise declaration this dissent adopts as precedent. It is sufficient to conclude that *Hertz* has also prompted numerous law review comments and critiques and is cited recurrently in the new publication, Equipment Leasing—Leveraged Leasing, edited by Fritch and Reisman, as a leading and significant case in commercial law.

pose. It was the intention of the draftsmen of the Code that the courts have a broad equitable tool to attack the unconscionable features of a contract directly and openly. Spanogle, *Analyzing Unconscionability Problems*, 117 U.Pa.L.Rev. 931, 937 (1969); § 400.2–302 [U.C.C. Comment 1]. One of the principal uses of the unconscionability doctrine has been to subject form contracts to scrutiny to determine the assent actually given to the printed terms. The most frequent beneficiaries of unconscionability § 400.2–302 have been poor, illiterate and otherwise disadvantaged consumers [*Jefferson Credit Corp. v. Marcano*, 60 Misc.2d 138, 302 N.Y.S.2d 390 (1969) and other cases cited in White and Summers, supra, § 4–3, n. 28], but [contrary to the majority contention] the courts have become increasingly aware that the principle applies fairly between businessmen and corporations as well. *Electronics Corp. of America v. Lear Jet Corp.*, 55 Misc.2d 1066, 286 N.Y.S.2d 711 (1967); *United States Leasing Corp. v. Franklin Plaza Apts.*, 65 Misc.2d 992, 319 N.Y.S.2d 531 (1971).

The lease between Funding Systems and King Louie is a form contract drafted and supplied by Funding Systems. The only inserted terms are the names and addresses of the lessee [King Louie] and of the supplier of the equipment [IGM], the quantity and description of the goods, and the terms of payment. The rest of the lease consists of Terms and Conditions stated in twenty-six numbered paragraphs, all, except for paragraph three, in inconspicuous print.

Paragraph three is headed: NOTICE OF INTENDED ASSIGNMENT: NO WARRANTIES BY LESSOR OR LESSOR'S SUCCESSOR OR ASSIGNEE; MAINTENANCE, COMPLIANCE WITH LAWS. Then follows in fine print acknowledgment by lessee that lessor intends to assign the lease and the agreement of lessee not to assert against the assignee any defense, set-off or claim lessee may have against the lessor which arises "under this lease or any other transaction or otherwise." Then in boldface red print [as an ostensible compliance with § 400.2–316 for exclusion of implied warranties], paragraph three continues to recite:

THAT THE LESSEE REPRESENTS THAT LESSEE HAS SELECTED THE EQUIPMENT LEASED HEREUNDER PRIOR TO HAVING REQUESTED THE LESSOR TO PURCHASE THE SAME FOR LEASING TO THE LESSEE, AND LESSEE AGREES THAT THE LESSOR HAS MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE, DIRECTLY OR INDIRECTLY, EXPRESS OR IMPLIED, AS TO THE SUITABILITY, DURABILITY, FITNESS FOR USE, MERCHANTABILITY, CONDITION, QUALITY, OR OTHERWISE OF ANY SUCH UNIT. LESSEE SPECIFICALLY WAIVES ALL RIGHTS TO MAKE CLAIM AGAINST THE LESSOR HEREIN FOR BREACH OF ANY WARRANTY OF ANY KIND WHATSOEVER AND AS TO LESSOR, OR LESSOR'S ASSIGNEE, LESSEE LEASES THE EQUIPMENT "AS IS." LESSOR AND LESSOR'S ASSIGNEE SHALL NOT BE LIABLE TO LESSEE FOR ANY LOSS, DAMAGE OR EXPENSE OF ANY KIND OR NATURE CAUSED DIRECTLY OR INDIRECTLY BY ANY UNIT LEASE HEREUNDER OR THE USE OR MAINTENANCE THEREOF OR THE FAILURE OF OPERATION THEREOF, OR THE REPAIRS, SERVICE OR ADJUSTMENT THERETO, OR BY ANY DELAY OR FAILURE TO PROVIDE ANY THEREOF, OR BY ANY INTERRUPTION OF SERVICE OR LOSS OR USE THEREOF OR FOR ANY LOSS OF BUSINESS OR DAMAGE WHATSOEVER AND HOWSOEVER CAUSED.

The paragraph resumes in fine print to recite that neither the lessor nor assignee has any obligation to install, adjust or service the equipment; that lessee has the expense of the operation, repairs and maintenance of the equipment; and that no defect relieves lessee of the obligation for payment under the lease.

*Paragraph three*, in sum, is the agreement of lessee [King Louie] to waive asser-

tion of any defense or claim against the assignee lessee may have against lessor [Funding Systems] under *any* transaction; the agreement to exclude from the transaction implied warranties of merchantability and fitness for use of the equipment; assumption by lessee of all loss from failure of the equipment and for consequential damage by business interruption or otherwise; the assumption by lessee of the cost of repair and maintenance of the equipment; and acknowledgment by lessee of the absolute obligation to pay for the equipment.

*Paragraph four* reiterates that the lessor shall not be liable for damage from any cause and requires the lessee to inspect the equipment within three business days of delivery, after which in the absence of complaint, lessee would be conclusively presumed to have received the equipment in a condition compliant with the agreement.

*Paragraph eleven* allows the lessor to assign the lease without notice or consent of lessee and repeats that the obligations of the lease shall not be subject to any claim or defense available to the lessee against the lessor.

*Paragraph twelve* provides that failure of lessee to pay any installment shall constitute default and accelerate the balance due under the lease as liquidated damages.

*Paragraph thirteen* provides that the lessee shall have no option to purchase or otherwise acquire ownership of the equipment.

*Paragraph fifteen* renders the remedies of the lessor cumulative and not exclusive.

*Paragraph sixteen* renders the lease irrevocable.

*Paragraph twenty-one* is a waiver by the lessee of trial by jury and interposition of counterclaim or setoff against the lessor in any litigation on the lease.

*Paragraph twenty-two* agrees that the lease is a contract under New York law and chooses the law of that state to determine the rights and duties of the parties.

The lease was executed by King Louie on May 7, 1970, but prior to that date, two terms of the form were modified by correspondence: an option to purchase was added upon payment by the lessee of $1 at the end of the lease term [a modification of paragraph thirteen] and the time for acceptance of the equipment was advanced from three to ten days [a modification of paragraph four].

A separate but related LESSEE'S ACKNOWLEDGMENT & DELIVERY ACCEPTANCE RECEIPT was executed by King Louie concurrently with the subscription to the lease. That paper acknowledged receipt of the merchandise in good condition although, as found by the trial court and shown by evidence, delivery was not actually made until at least the end of that May.[7]

It is the contention of King Louie that a contract whereby a lessor-seller disclaims all liability from useless goods yet holds a lessee-buyer to an absolute noncancellable obligation to pay for them is unconscionable within § 400.2–302 and should not be enforced.

Section 400.2–302 provides:

(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause so as to avoid any unconscionable result.

(2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the par-

---

**7.** The RECEIPT iterated again the agreements of paragraphs three and eleven of intention by lessor to assign and the promise of lessee to pay to the assignee the obligation under the contract notwithstanding any defense, setoff or' counterclaim available against lessor with the proviso that "the Lessee reserv(es) its right to have recourse directly against the Lessor on account of any such defense, set-off or counterclaim"—in clear contradiction of the terms of paragraph twenty-one which recites the waiver of the lessee of all remedies against the lessor under the lease.

ties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

The term unconscionability comes without definition but not without meaning. "The principle is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power." [§ 400.2–302, U.C.C. Comment 1]. The elements *unfair surprise* and *oppression* have been translated by commentators,[8] and accepted by the courts [and the majority opinion], as a distinction between procedural and substantive unconscionability. Procedural unconscionability refers to abuse in the contract formation process and substantive unconscionability refers to resultant harsh and unreasonable terms of contract.[9] In these terms, unconscionability does not interfere with freedom of contract, but redresses unfair results from the lack of free assent to the terms of agreement. *Industralease Automated & Scientific Eq. Corp. v. R.M.E. Enterprises, Inc.*, supra, l. c. 431, *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (U.S.App.D.C.1965).

Although unconscionability § 400.2–302 applies to all contracts, the statute is the particular response of the Code to the inability of the traditional law to deal with the unfairness of form contracts—most pertinent here. On conventional rules, a consumer who signs a form prepared by a seller or lender thereby manifests intent to be bound by all its terms—even though he had not read them and could neither understand nor change them if he had. It was the insight of Llewellyn, chief architect and draftsman of § 400.2–302, that the traditional doctrine that a signature manifests assent overlooks the special nature of a form contract. Llewellyn saw in every standard form contract two separate agreements: one agreement from the terms actually bargained and specifically given assent by the nondrafter and the other agreement from the boilerplate, rote, nonnegotiated and, almost certainly, unread terms of the printed form. [K. Llewellyn, *The Common Law Tradition*, 370–371 (1960)]:

> Instead of thinking about "assent" to boiler-plate clauses, we can recognize so far as concerns the specific, there is no assent at all. What has in fact been assented to specifically are the few dickered terms, and the broad type of the transaction, and but one thing more; that thing more is a blanket assent [not a specific assent] to any not unreasonable or indecent terms the seller may have on his form, which do not alter or eviscerate the reasonable meaning of the dickered terms. The fine print which has not been read has no business to cut under the reasonable meaning of those dickered which constitute the dominant and only real expression of agreement.

Thus, the assent given to the printed terms of a form contract—by *consumers and businessmen alike*—is limited by the common understanding of the parties that: first, the form terms may not alter the negotiated terms and, second, the rote clauses may not be unreasonable singly or in total effect. Spanogle, *Analyzing Unconscionability Problems*, 117 U.Pa.L.Rev. 931, 940 (1969). When a form contradicts

---

**8.** Leff, *Unconscionability and The Code—The Emperor's New Clause*, 115 U.Pa.L.Rev. 485, 498 et seq. (1967); Spanogle, supra; White & Summers, supra, § 4–2, pp. 117 et seq.

**9.** The most common species of procedural unconscionability is the unfairness which results from inequality of bargaining power—as by a merchant who sells by a form contract in English, a language not understandable to the consumer [*Frostifresh Corp. v. Reynoso*, 52 Misc.2d 26, 274 N.Y.S.2d 757 (1966), rev'd on other grounds, 54 Misc.2d 119, 281 N.Y.S.2d 964 (1967)—and the lack of a meaningful choice, *Jones v. Star Credit Corp.*, 59 Misc.2d 189, 298 N.Y.S.2d 264 (1969). There are numerous other indicia of assent unfairly induced. The most common indicium of substantive unconscionability is unreasonableness from grossly one-sided terms which attempt to change the substance of the bargain, especially by the use of exculpatory clauses, disclaimers and intermeddling with remedies. *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.S.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685 (1968); *Electronic Corp. of America v. Lear Jet Corp.*, 55 Misc.2d 1066, 286 N.Y.S.2d 711 (1967).

these basic expectations by terms grossly imbalanced in favor of the drafter then "the rule that a man is presumed to have agreed to what he signs [apt enough when two solicitors have wrestled over an individual deal] runs at flat variance with the facts of life and with the facts of printed form pads." Llewellyn, *Common Law Reform of Consideration: Are There Measures?*, 41 Colum.L.Rev. 863, 869–870 (1941). This principle of unconscionability [§ 400.2–302] that unfair hidden clauses do not bind the nondrafter has been continued in Restatement (Second) of Contracts, § 237, Comments b and c (1973), in 1A Corbin on Contracts, § 33, p. 131 (1963), in the comments of academicians and in the case law. Calamari, *Duty to Read—A Changing Concept*, 43 Fordham L.Rev. 341 (1974).

The determination of unconscionability in a particular case is one of law for the court and by the express terms of the statute and must be made on evidence of the "commercial setting, purpose and effect" of the transaction. *Zicari v. Joseph Harris Co.*, 33 App.Div.2d 17, 304 N.Y.S.2d 918, 935 (1969); [§ 400.2–302, U.C.C. Comment 3].[10]

The lease form in litigation does not describe the actual transaction between Funding Systems and King Louie. It simulates the classic three-party finance transaction to an actual two-party lease-purchase and so undertakes to force economic and legal consequences the true undertaking does not contemplate. The printed terms of the form are designed for a transaction where-

by a business [King Louie] selects goods from a supplier [IGM] and solicits an entrepreneur [Funding Systems] to finance the debt by a lease device. The lessor by printed conditions of lease then undertakes to make the obligation of the lessee to pay the installments absolute and at the same time insulates itself from all liability to the lessee from the transaction. Thus, paragraph three recites in boldface red-ink print: THAT THE LESSEE REPRESENTS THAT LESSEE HAS SELECTED THE EQUIPMENT LEASED HEREUNDER PRIOR TO HAVING REQUESTED THE LESSOR TO PURCHASE THE SAME FOR LEASING TO THE LESSEE, AND LESSEE AGREES THAT THE LESSOR HAS MADE AND MAKES NO REPRESENTATIONS OR WARRANTIES OF WHATSOEVER NATURE . . . etc. In fact, as the evidence shows and the trial court found, King Louie had already concluded a five-year agreement with IGM to lease the automated broadcast system with an option to purchase the equipment at the end of the term for an additional One Dollar. It was IGM, to repeat, which overtured Funding Systems to finance the lease-sale and the resultant agreement between Funding Systems and King Louie was for the benefit of IGM alone. Funding Systems took the relationship between IGM and King Louie as found and became a surrogate seller and conformed with the insistence by King Louie that the form contract be amended to include the same op-

---

10. The inquiry into unconscionability under § 402.2–302 becomes a matter of law under the Code both as to the process of contract formation as well as the substantive agreement. Thus, the element of assent, nature of agreement, and all others are determinable on appeal according to the entire commercial climate of the transaction. *Industralease Automated & Scientific Equipment Corp. v. R.M.E. Enterprises, Inc.* supra, l. c. 431[3, 4]. In that determination, a court of review, therefore, is not constrained by the rule in *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976).

As it was, the trial court concluded as a matter of law that the agreement between King Louie and Funding Systems "unconscionable in that it would deny that the Defendants can show the circumstances existing at the time, would destroy warranties of merchantability

and fitness to perform as represented and would deny and destroy the understanding and agreement among the parties that the equipment would belong to Defendant, King Louie, at the end of the period upon the payment of One Dollar ($1.00)." The majority attempts to avoid the effect of this conclusion of law on the theory that the order was merely interlocutory, but without citation or rationale other than the order "remained subject to later modification or reversal"—certainly an incident of any ruling made by the court in a trial to the bench. The determination of unconscionability by the trial court appears to contradict the findings of fact that Funding Systems was not a merchant but transacted in money. In candor, the litigation did not take focus until reargument on appeal.

tion to purchase provided by the contract terms with IGM. Whatever the terminology of the form, therefore, as between King Louie and Funding Systems, the actual transaction was that of a lease-purchase of chattels and not to finance a debt.

There were only four terms negotiated between Funding Systems and King Louie: description of the goods, terms of payment, option to purchase and extension of time for acceptance.[11] The balance of the lease terms, twenty-six separate paragraph terms and conditions of lease—except for a portion of paragraph three which in conspicuous print disclaims any warranty—is a mass of fine print trivia. The form protects, in terms sometimes contradictory to the DELIVERY ACCEPTANCE RECEIPT, Funding Systems and its assignee from any claim, counterclaim, setoff, remedy or jury trial to which the lessee may be entitled. The form recites many of these protections against the lessee from *any* transaction, whether or not under the lease. In short, Funding Systems undertakes to assert against King Louie all rights and to be exculpated from all liability a lessor might conceivably have against a lessee or be subject to under all circumstances however unrelated to the actual transaction. These terms are so grossly out of balance as to be beyond the reasonable expectations of the transaction. *Wilson Trading Corp. v. David Ferguson, Ltd.*, supra; *Electronic Corp. of America v. Lear Jet Corp.*, supra.

The basis of the bargain between IGM and King Louie and thereafter assumed by Funding Systems, was the lease-sale for an agreed price and payment of equipment that would operate as an automated broadcast system.[12] These were the negotiated terms and the very root of the contract. The printed forms which deny a lessee [in this case, King Louie] to assert a defense against the lessor [a status assumed by Funding Systems] when the fundamental basis for the contract fails [a failure of consideration, in conventional terminology] and yet requires absolute obligation for full payment goes contrary to expectations of the nondrafter and in good conscience cannot be enforced. *Industralease Automated & Scientific Eq. Corp. v. R.M.E. Enterprises, Inc.*, supra, l. c. 432; *Zabriskie Chevrolet, Inc. v. Smith*, 99 N.J.Super. 441, 240 A.2d 195 (1968); 6 Corbin on Contracts, §§ 1256–1257; White & Summers, Uniform Commercial Code, § 9–2.

The parties are left free under the Code to shape their remedies to their own requirements [§ 400.2–719] but even this power to limit remedies is subject to the unconscionability principle of § 400.2–320. "[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available . . . [T]here [must] be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract . . . Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion . . ." [§ 400.2–719, Comment 1]. The exculpatory provisions iterated throughout the printed lease form which deny remedy to the lessee altogether are terms not codetermined by King Louie but merely inserted by the lessor. They alter the fair meaning of the dickered terms and so subvert the basic bargain without assent of the other party to the contract. "Unconscionability arises from the inequity of compelling payment for equipment that can't be used without the right to interpose a defense or set-off. From the point of view of the user it makes little difference that he is labeled a buyer or lessee. In either case the agreement is

---

**11.** Even the negotiated agreement to extend time for acceptance from three days [as provided by paragraph four of the printed form] to ten days is at variance with the actual transaction because the form DELIVERY ACCEPTANCE RECEIPT shows that the equipment was accepted by King Louie on May 7, 1970, [the date the lease was also signed] when, in fact, the equipment was not in place until about June 1, 1970.

**12.** The evidence establishes another, simpler, remedy: revocation of acceptance. [§ 400.2–608; *Industralease Automated & Scientific Eq. Corp. v. R.M.E. Enterprises, Inc.*, supra, l. c. 432, n. 5]. That issue was not made or presented.

unconscionable if the user must pay for something he can't use without the right to assert a meritorious defense or set-off." *United States Leasing Corp. v. Franklin Plaza Apts.,* supra.

Funding Systems contends [and the majority opinion stresses], however, that there was no unfairness in the contract formation process because there was no disparity in bargaining power between the lessor and lessee, both million-dollar corporations. Contrary to contention, however, unconscionability does not operate only to relieve a consumer disadvantaged by a one-sided contract induced by an imbalance of the power to bargain. The purpose of the unconscionability section is "the prevention of oppression and unfair surprise  .  .  . and *not* of disturbance of allocation of risks *because of superior bargaining power.*" [§ 400.2–302, U.C.C. Comment 1, emphasis supplied.] The primary concern which prompted adoption of the unconscionability section was recognition that there was little reliance by businessmen on the force of the printed terms in the form contract transactions between them. This section undertakes to relieve the artificial rule which accords the form terms effect on principles of freedom of contract although no assent to the hidden terms was given or intended. Deutch, *Unfair Contracts: The Doctrine of Unconscionability,* p. 118 (Lexington Books 1977). As the citations of decisions on the U.C.C. Comments to that section signify, *unconscionability relates to merchant-to-merchant transactions as well as to consumer contracts.*

An imbalance in bargaining power, of itself, does not render a contract unconscionable if the result is not substantively unreasonable. *Allen v. Michigan Bell Telephone Company,* 18 Mich.App. 632, 171 N.W.2d 689, 692[5] (1969). In consumer contracts, the particular status of the individual—for instance, his limited knowledge of English—may contribute to the disparity and so induce intervention by the court. *Jefferson Credit Corp. v. Marcano,* 60 Misc.2d 138, 302 N.Y.S.2d 390 (1969). In the corporation-to-corporation transaction between Funding Systems and King Louie,

however, the justification for judicial interference rests on the indisputable fact [established by the very evidence of Funding Systems] that the lessee had no choice but to accept the form terms which required full payment for the equipment yet exculpated the lessor for all liability. The lease-purchase which eventuated between Funding Systems and King Louie was placed with Funding Systems by lease-broker International Financing, Inc. at the request of IGM to finance the lease-purchase debt of the original transaction with King Louie. Larson, President of International Financing, Inc. and concurrently Regional Manager of Funding Systems, testified that the lease form used in the transaction was in the terms used by every lessor-financer of equipment in the industry. "The layout of the lease may be different, but they are virtually all the same." He testified certainly that "no leasing company that is in general equipment leasing business  .  . extends warranties, maintenance, merchantability of any product." Every such lease throughout the industry contains warranty disclaimers, exculpatory clauses which limit remedies and those other terms which insulate the lessor and assignee from actions and counterclaims. The legal terminology of the equipment lease document is thus made to conform to the requirements of the large financial houses, particularly Chase Manhattan Bank and New York Chemical Bank, which are the major sources for such credit. In fact, the equipment lease form between Funding Systems and King Louie is a virtual adhesion contract which allows the nondrafter no choice as to terms. It is a contract form prepared by the industry and required in every equipment lease transaction. The printed form takes advantage of the lack of any real alternative to a lessee to impose terms which demand full payment but allows no recourse for goods which prove to be worthless. An equipment lessee has no choice but to accept a contract on the terms offered or do without the goods altogether. Such a contract is grossly one-sided and oppressive. It is manifestly unreasonable and uncon-

scionable and should not be enforced. [§§ 400.1–102(3) and 400.2–302].

The cases discoursed prominently by the majority opinion, *Leasco Data Proc. Equip. Corp. v. Starline Overseas Corp.*, supra, and *In re Sherwood Diversified Services, Inc.*, 382 F.Supp. 1359 (S.D.N.Y.1974) do not contradict the conclusion of this dissent. Neither decision involves, as does this case, a form contract which does not describe the actual transaction. Rather, each describes a true finance lease contemplated and assented to as such. In each case the purchaser-lessee designated the equipment which was then *purchased by the finance-lessor at the actual request of the lessee* —as the Funding Systems-King Louie agreement simulates but does not do.

The majority opinion shows concern that to hold the form contract unconscionable would undermine finance-lease transactions and unsettle a useful commercial device. The majority expresses also that the disclaimer of warranty as a reasonable device for a debt financer is proved by its universal currency in the commercial world. A true finance-lessor has no cause for unease because such activity, by definition, is transaction in money and so beyond the scope of the warranty provisions of Article 2 on Sales. Had the event described in the form agreement between Funding Systems and King Louie reflected an actuality, King Louie would have no basis for the claims for warranty and defenses it now asserts. I have no cause to doubt that Funding Systems was in the business to finance equipment leases and not to sell goods and comported in all other instances as a transactor

in money beyond the scope of Article 2 on Sales. I say only that as to *this transaction* and *this set of circumstances* Funding Systems acted the role of a seller and so owes King Louie the duty of a merchant under the Code.[13] The duty of a court is to refuse an unconscionable sale by rescission of contract, enforcement of warranty, or other remedy to restore the contractors to status quo.

For these reasons, I dissent.

**13.** The disclaimers of warranty and defense in an assignment of sale, as these circumstances show, are vulnerable under § 400.9–206 on Secured Transaction [a species of commercial transaction the majority opinion agrees describes the undertaking between IGM, King Louie and Funding Systems]. U.C.C. Comment 3 to that section states:

Subsection (2) makes clear . . . that purchase money security transactions are sales, and warranty rules for sales are applicable. It also prevents a buyer from inadvertently abandoning his warranties by a "no warranties" term in the security agreement when warranties have already been created

under the sales arrangement. *Where the sales arrangement and the purchase money security transaction are evidenced by only one writing, that writing may disclaim,* limit or modify warranties to the extent permitted by Article 2." [Emphasis added.]

See also, Equipment Leasing—Leveraged Leasing, Edited by Fritch & Reisman (Second Printing), pp. 45 et seq.; *National Bank of N. America v. DeLuxe Poster Co.,* 18 U.C.C. 802 (N.Y. App.Div.1976); *General Elec. Credit Corp. v. Glamorous Laundry Rooms, Inc.,* 8 U.C.C. 1119 (N.Y.Sup.Ct.1971). The avoidance of the waivers on that ground, however, was not asserted by King Louie.